**AAA WRECKING CO., INC., Appellant-Defendant,**

**v.**

**BARTON, CURLE & McLAREN, INC., Appellee-Plaintiff.**

**No. 2–1277A479.**

Court of Appeals of Indiana, Fourth District.

Oct. 16, 1979.

Robert S. Rifkin, Rifkin & Gilman, Indianapolis, for appellant-defendant.

Gary R. Landau, Buck, Berry, Landau, Breunig & Quinn, Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

The cause of action in this case is a Complaint On Account filed by plaintiff appellee Barton, Curle, and McLaren, Inc. (BC&M) against defendant appellant AAA Wrecking Co., Inc. (AAA) to collect premiums allegedly due and owing for an insurance policy supplied by BC&M to AAA. AAA filed a counterclaim to recover certain premium overpayments. After a bench trial, the court entered judgment in favor of BC&M and denied AAA's counterclaim. AAA appeals arguing the decision of the lower court to be unsupported by the evidence and contrary to law.

We reverse.

Many of the facts relevant to this appeal were not disputed at the trial. On November 9, 1973, AAA submitted a $200,000 bid proposal to Frank P. Thomas for the demolition of the Thomas Building located in downtown Indianapolis. AAA specified in its bid that it would furnish insurance on the job in the amount of $1,300,000.00, the amount normally carried by the corporation. This initial proposal was rejected by Thomas, one of the reasons being that Thomas wanted AAA to carry extra insurance referred to as "collapse coverage."

Thomas and AAA agreed the details of the additional collapse coverage would be worked out by Thomas and BC&M, AAA's insurance agent. Thomas also agreed to reimburse AAA for the cost of the additional collapse coverage by adjusting the original $200,000 bid upwards to reflect the additional insurance costs.[1]

Per AAA's request, BC&M negotiated the matter of additional coverage with Thomas during February of 1974 and an agreement was reached. It is undisputed that BC&M did in fact provide AAA with collapse coverage to the satisfaction of Thomas.

By a letter of April 3, 1974, while demolition was in progress, BC&M requested premium payments from AAA in the amount of $4,198 for the collapse coverage provided to AAA for the Thomas Building demolition. AAA refused payment, and this lawsuit followed.[2]

AAA's position at the trial, advanced primarily through the testimony of its President, Winston Knauss, was that AAA requested BC&M provide Thomas with a figure representing the cost of the additional insurance so AAA's original $200,000 bid could be adjusted upwards to reflect that additional expense. In this manner the additional coverage was to be paid for, indirectly, by Thomas. However, AAA maintained BC&M provided Thomas with a cost figure of only $1,871, which was less than the full cost of the collapse coverage. Therefore, AAA argued, it relied upon BC&M's $1,871 quotation to its detriment and should not be required to pay the full $4,198 billed to it by BC&M.

## I. EQUITABLE ESTOPPEL

The theory upon which AAA relied for its defense is equitable estoppel. Ind. Rules of Procedure, Trial Rule 8(C) imposes the burden of pleading estoppel or any other matter of avoidance upon the defendant. While it appears from the record that AAA failed to plead estoppel as an affirmative defense, it further appears the matter was litigated by the implied consent of the par-

1. In addition to the extra insurance coverage, Thomas requested AAA to incorporate into its proposal the rental of a lot to be used for the storage of heavy equipment, the erection of a steel protection shield over an adjacent building, and the filling of an excavation under the sidewalk in front of the Thomas Building. AAA agreed to these modifications and Thomas agreed to pay AAA $15,000 over and above the initial $200,000 bid, to cover the cost of this additional work. This raised the cost of the job to $215,000. The last price adjustment was to be for the cost of the "collapse coverage."

2. While BC&M requested payment of $4,198.00 for the additional insurance on the Thomas Building demolition, BC&M prayed for only $3,544.61 in its complaint after deducting certain premium overpayments made by AAA. These overpayments were the subject of AAA's counterclaim and were admitted by BC&M in its answer.

ties. Ind. Rules of Procedure, Trial Rule 15(B). Since AAA had the burden of proof on the issue of estoppel at trial, its appeal is one from a negative finding. As such, the finding may only be disturbed as being contrary to law where the evidence is without conflict and leads to but one conclusion and the trial court reached an opposite conclusion.[3] *Link v. Sun Oil Co.,* (1974) 160 Ind.App. 310, 312 N.E.2d 126.

The facts necessary to establish equitable estoppel were defined in *Emmco Insurance v. Pashas,* (1967) 140 Ind.App. 544, 224 N.E.2d 314 as follows:

(1) A representation or concealment of material facts;

(2) The representation must have been made with knowledge of the facts;

(3) The party to whom it was made must have been ignorant of the matter;

(4) It must have been made with the intention that the other party should act upon it;

(5) The other party must have been induced to act upon it.

140 Ind.App. at 551, 224 N.E.2d at 318.

■ In *Phar-Crest Land Corp. v. Therber,* (1969) 251 Ind. 674, 244 N.E.2d 644, our Supreme Court noted that one asserting the defense of estoppel carries the burden of proving a fraudulent representation *or* such negligence as will amount to fraud in law. The "fraud" may be "constructive" in a sense that there may not be any active intentional purpose to deceive or defraud, yet the action is so prominent and misleading as to induce detrimental reliance. The court in *Phar-Crest Land Corp.* cited with approval the statement found in *Pitcher v. Dove,* (1884) 99 Ind. 175, at 177, 178:

> * * * It is well settled that there need not be any design to defraud in order to constitute an estoppel. It is sufficient if the conduct of the party has been knowingly such as would make it unconscionable on his part to deny what his conduct had induced another to believe and act upon in good faith and without knowledge of the facts.

After a careful review of the record, we hold AAA carried its burden of proving equitable estoppel in this case, and in light of the evidence, the decision of the trial court was contrary to law.

Our decision requires a rather detailed review of the testimony of each witness at trial. Winton Knauss, AAA President, testified he requested BC&M negotiate for additional insurance coverage with Thomas

3. The trial court did not make special findings of fact in support of the judgment. However, at the end of closing arguments, the trial judge stated:

> Gentlemen, from what I have before me and piecing together what I can, I understand that from what the documents show and what it shows, that the Thomas Building that was to be wrecked and they were to pay the cost of the additional insurance that the Defendant did not have, which amounted to eighteen hundred and seventy-one dollars ($1,871.00) which was put into the contract, from which he received the payment and did not reimburse the Plaintiff and that all of the other business was for renewal of a policy that was already in effect and from what I have before me, I would have to rule that the Plaintiff has borne its responsibility and I would have to show a judgment here for the Plaintiff in the amount of thirty-five forty-four, sixty-one ($3,544.61), from what I have before me.

It appears the judge was understandably confused by statements of BC&M Vice-president Brian Field to the effect that at the same time the Thomas job negotiations were underway, BC&M was in the process of renewing AAA's basic liability coverage. However, there is clearly lacking any evidence which would suggest the cost of the additional collapse insurance for the Thomas job to be only $1,871.00. Field himself testified the collapse coverage developed a flat rate of $4,000.00. In addition, defendant's Exhibit A, a letter from BC&M's Jerry Pesavento to Winston Knauss, reads in part:

> Dear Winston:
> Enclosed is an endorsement adding contractual liability coverage for the contract between AAA Wrecking Company and Frank P. Thomas for demolition of the Thomas Building. The additional premium for this contract is $189.00 and our invoice for this amount is attached. We are also enclosing the endorsement providing collapse coverage for the demolition of the Thomas Building at 15 East Washington Street. There is a $250.00 property damage deductible on this coverage. The premium for this specific coverage is $4,000 and our invoice for this amount is attached.

and provide Thomas with the cost of the additional collapse coverage so the amount could be added to the original $200,000 bid. Knauss stated he trusted BC&M completely, as BC&M had been AAA's insurance broker for almost two years prior to the Thomas negotiations.

Mr. Joseph Carney, an attorney employed by Thomas at the time in question, testified he received a telephone call from Al Adams of BC&M and was given the figure $1,871 which he understood to be the cost of the excess coverage necessary for AAA to do the Thomas demolition.[4] Carney stated this $1,871 figure was then added to the original $200,000 proposal to arrive at the final contract price in the demolition agreement.[5]

This testimony from Knauss and Carney was not contradicted by BC&M. Mr. Brian Field, Vice-president of BC&M, admitted BC&M was given full authority to negotiate the additional insurance coverage with Thomas on AAA's behalf. Field testified that while he was familiar with the AAA account, he was not personally involved in any dealings with the Thomas representatives. Field stated Mr. Pesavento,[6] his employee, did take an active role in the negotiations. On cross-examination, Field testified as follows:

Q. Now, isn't it also a fact that Winston discussed with you or told you that the insurance—any additional cost of insurance premiums beyond what his normal, what he normally carried, would be paid for indirectly by the Thomas people. In other words he would ask you to furnish the Thomas people with whatever costs that additional insurance would be and that they would then include—increase Winston's contract price by whatever the additional amount of that insurance would be?

A. I remember discussing with Winston the fact that additional insurances were going to have to be required. The question of whether we were to furnish them to the Thomas people I don't recall. I had no knowledge of the contract price, final contract price, until the day we were requested to furnish the certificates of insurance so they could go to work.

Q. Well, isn't it a fact, though, Mr. Field, that your company did, in fact, give insurance costs to Mr. Joseph Carney, attorney with Baker & Daniels who actually drafted this contract and you told him how much this additional insurance would cost?

A. There may have been some estimates of cost in connection with the umbrella coverage and the other coverages that there were requested discussed with Mr. Carney, not by myself and at this point in time I don't know who gave them to him, if they were given to him.

We are mindful of our role as a court of review which prohibits our weighing conflicting evidence to arrive at a conclusion different than reached by the trier of fact. However, undisputed evidence in this case leads us to the conclusion that BC&M, as AAA's agent, was charged with the responsibility of negotiating the additional insurance coverage with Thomas. Secondly, Mr. Carney, a disinterested witness stated a $1,871.00 figure was provided by BC&M to Thomas representing the cost of additional insurance. This $1,871.00 figure was in fact added to the final contract price agreed upon by Thomas and AAA. The only reasonable inference which can be drawn from these facts is that BC&M knew, or should have known, AAA would rely upon the $1,871.00 figure given to Thomas prior to the execution of the demolition contract. AAA did in fact rely on the $1,871.00 figure to its detriment. In light of the business relationship of the parties, there was nothing to indicate AAA's reliance was not justified.

Where, as in this case, a party with knowledge of the facts, makes a representation of a material fact with the knowledge, actual or constructive, that another party

4. Adams did not testify at the trial.

5. The final contract price was $216,871.00.

6. Pesavento did not testify at the trial.

will rely upon it, and where the representation does induce reliance by the other party, the party making such representation will be estopped from denying its truth and effect to the extent justice requires. Based upon the evidence, we hold BC&M was estopped from recovering from AAA premiums for the collapse coverage in excess of $1,871.00, the figure provided to Thomas and relied upon by AAA in its final contractual negotiations.

The decision of the trial court is reversed with instructions that judgment be entered on AAA's counterclaim in the amount due and owing for premium overpayments to BC&M.

MILLER, P. J., and YOUNG, J., concur.