**In the Matter of Charles Damon MIEDL, a child under the age of 18 years.**

**and**

**In the Matter of Shaun David MIEDL, a child under the age of 18 years.**

**No. 3–480 A 94.**

Court of Appeals of Indiana, Fourth District.

Feb. 18, 1981.

Rehearing Denied April 15, 1981.

Kevin B. McGrath, Edward M. Ober, Michigan City, for appellant.

Donald E. Transki, Michigan City, for appellee.

CHIPMAN, Judge.

This is a parental rights termination case. Glenda Miedl is the mother of 2 children, Charles, presently 4½ years old and Shaun, presently almost 3 years old. On October 9, 1979, the trial court terminated Glenda's parental rights. She appeals raising the following issues:

1. Whether the trial court erred in terminating Glenda's parental rights under IC 31–6–5–4, part of the new Juvenile Code which became effective on October 1, 1979; and

2. Whether the court's decision is supported by sufficient evidence.[1]

We reverse.

## FACTS

On August 21, 1976, Glenda was arrested for disorderly conduct and on August 23 she was sent to the psychiatric floor of the LaPorte Hospital for 72 hour observation. A petition was filed in LaPorte Juvenile Court alleging Charles, then 3 months old, was a neglected child due to his mother's absence. Charles was made a temporary ward of the County Welfare Department (Department). On August 31, custody of Charles was returned to Glenda and an aunt but the wardship continued. On November 30, custody of Charles was again taken by the Department after a petition was filed by a juvenile probation officer alleging Glenda had threatened Charles' life.

After a hearing on July 12, 1977, the custody of Charles was returned to Glenda but wardship remained with the Department.

On April 24, 1978, Shaun was born, 6 weeks premature. He remained in the hospital due to a respiratory problem. On May 8, Glenda was again committed to the psychiatric floor of the LaPorte Hospital. She telephoned a Department caseworker and asked her to pick up Charles and he was taken to a foster home. On May 11, Shaun was ready to be released from the hospital and a petition was filed with the Juvenile Court alleging Shaun was a dependent and neglected child due to Glenda's commitment. This petition was granted and Shaun was made a temporary ward of the Department.

Both wardships continued and a hearing on whether to terminate the wardships was held on June 15, 1978. At this hearing Judge Donald Martin continued the wardships and set goals for Glenda to achieve before the court would terminate them. She was to become a rational, reasonable adult person, learn to cope with everyday life, avoid excess temper, emotional outbursts, alcohol, and drugs. She was to maintain a good personal appearance, a clean home, and attain financial stability.

On February 28, 1979, Glenda was given custody of Shaun and on March 6, custody of Charles. The trial court felt it would give Glenda a trial period with both children to see if she could handle them. She kept both children until May 2, when she went to the hospital emergency room complaining of headaches and vomiting. She took her children with her and the hospital called her caseworker to pick up Glenda and the children. The caseworker, Patricia Kasko, telephoned Judge Martin and he told her to return the children to their foster parents.[2]

A Petition for Termination of Wardship was filed by Glenda on May 30, alleging she had accomplished Judge Martin's goals and that it would be in the best interests of her children for the court to terminate their wardships. A Petition to Terminate Parental Rights was filed by Caseworker Kasko on June 8 alleging Glenda's parental rights should be terminated "for the health, welfare and future of the minor" children.[3] A hearing was held on both petitions on September 27, and October 3, 1979.

---

1. Glenda has raised a third issue concerning the admission of interrogatories into evidence but in light of our decision to reverse we do not feel it is necessary to address this issue.

2. It is not clear from the record whether both children have the same foster parents.

3. The father of Charles consented to adoption. The father of Shaun is unknown.

On October 9, Judge Martin entered his order granting the Department's termination of parental rights petition. The court found Glenda was unable to handle everyday problems in rearing children. It determined IC 31–6–5–4 applied to Shaun but did not state what law it applied to Charles.

## I. APPLICABLE LAW

Glenda argues the court improperly applied IC 31–6–5–4 when it terminated her parental rights to Shaun and that there was insufficient evidence to terminate Charles under either IC 31–3–1–6(g)(7) (repealed effective October 1, 1979) or under IC 31–5–7–15(5) as interpreted by *Matter of Perkins,* (1976) 170 Ind.App. 171, 352 N.E.2d 502. We believe the court acted properly in applying IC 31–6–5–4 to Shaun and it erred in not applying the same section of the new Juvenile Code to Charles.

The new Juvenile Code was enacted in 1978 as part of Public Law 136. Section 59 of that law states: "[T]his act takes effect October 1, 1979; this act does not apply to matters in which a court has entered a dispositional decree before October 1, 1979, except that a person authorized to move for modification of judgment may petition the court to apply this act in such a matter."

Wardships are awarded by entering a dispositional decree, according to IC 31–6–4–16(d), and since both children were made wards of the Department prior to October 1, 1979, Glenda argues IC 31–6–5–4 was not applicable to the parental rights termination proceeding.

Glenda reads the word "matters" contained in § 59 as being synonymous with the words "case" or "cause" and cites *Malone v. Conner,* (1963) 135 Ind.App. 167, 189 N.E.2d 590 for the rule that statutes are to be construed as having a prospective operation unless the language employed clearly indicates the statutes were intended to be retrospective. While we agree with the basic rule cited, we disagree with her interpretation given to the word "matters."

If we interpreted "matters" as suggested by Glenda we would reach an absurd result. Under Glenda's interpretation, if a parent

had 2 children, and one was made a ward of the Department before October 1, 1979, and the other after that date, then those two similarly situated children would be treated under two different groups of laws, i. e. the statutes repealed October 1, 1979, and the new Juvenile Code. Additionally, depending on the ages of the two similarly situated children, this dissimilar treatment under the law may continue for several years until they reach the age of majority. It cannot be assumed the legislature expects its enactments to be applied in an absurd manner. *Pryor v. State,* (1973) 260 Ind. 408, 296 N.E. 125.

Judicial interpretation of a statute is warranted where its meaning or its language is ambiguous. *Bowman v. State,* (1979) Ind.App., 398 N.E.2d 1306. In this case the word "matters" is quite ambiguous. When construing or interpreting a statute our primary goal is to give effect to the intent of the legislature. *Matter of Estate of Wisely,* (1980) Ind.App., 402 N.E.2d 14, *Indiana State Board of Tax Commissioners v. Holthouse Realty Corporation,* (1976) 170 Ind.App. 232, 352 N.E.2d 535. To determine legislative intent, we look to the whole act, the law existing prior to the new act, to the changes made, the apparent motives for making them, *Bowman v. State, supra,* and the consequences that flow from the various interpretations. *Allen County Department of Public Welfare v. Ball Memorial Hospital Association, Inc.,* (1969) 253 Ind. 179, 252 N.E.2d 424.

■ There are numerous differences between the new Juvenile Code and the law it replaced. The new law provides new protections in various proceedings and mandates different time requirements in others. IC 31–6–1–1 lists the purposes and policies behind the act including an insurance of fair hearings and a recognition of constitutional and other legal rights of children and parents. The legislature must certainly have intended to insure these rights to all children and parents coming in contact with juvenile justice. As applied to the facts in this case, making the children wards of the

Department was a "matter" to which the new Juvenile Code did not apply. The termination of Glenda's parental rights is another "matter," in which the court had not entered a disposition decree before October 1, 1979. Therefore, IC 31–6–5–4 applied to the latter proceeding.

## II. SUFFICIENCY OF THE EVIDENCE

IC 31–6–5–4 sets out five conditions that must be met before a petition to terminate parental rights must be granted under IC 31–6–4–14(d):

"31–6–5–4 Petition for termination of rights; delinquent child or child in need of services

Sec. 4. A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of _____, a child, and _____, his parent (or parents)' and must allege that:

(1) the child has been removed from his parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that the conditions that resulted in his removal will not be remedied;

(3) reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;

(4) termination is in the best interests of the child; and

(5) the county department has a satisfactory plan for the care and treatment of the child."

Subsection (1) presents this court with a second ambiguous phrase that must be construed. The phrase "removed from his parent for at least six (6) months under a dispositional decree" is susceptible of numerous constructions depending on the various interpretations given "removed from his parent" and "for at least six (6) months." Employing the previously listed rules of statutory construction we construe this section to mean the parent must not have had physical custody of the child for the six months immediately preceding the filing of the petition.

The Department agrees with the interpretation that the "six month" period refers to the six months *immediately preceding* the filing of the petition. This provides for a forced period of separation between the parent and the child immediately prior to the initiation of the termination proceeding to determine the effect the separation has on both the parent and the child. It provides the trial court with a recent time period in which it can determine how the separation of the child from its parent has affected the child mentally, physically, and emotionally, and whether the separation has caused the parent to remedy the circumstances which led to his or her loss of custody. We do not believe it was the legislature's intention that this six month requirement could be satisfied by showing a child has been removed from his parent under a dispositional decree for *any* six month period. Such an interpretation would allow the six month removal requirement to be satisfied by a period of separation which occurred months or years prior to the filing of the termination petition. We do not think the then dated six month period would be very helpful to the court in determining the best interest of the child at the time termination is requested.

The Department disagrees that the phrase "removed from his parents" requires actual physical removal of the child from the parent. At oral argument, the Department seemed to be arguing this removal could be accomplished without taking physical custody of the child from the parent by making the child a ward of the court or of the Department. We disagree.

Subsection (1) speaks in terms of the child having been removed from his parent, it does not speak in terms of a parent having lost legal (as opposed to physical)

custody or having had his or her child made a ward of the Department. Additionally, in summarizing the requirement of IC 31–6–5–4, which must be explained to parents voluntarily consenting to termination of parental rights, IC 31–6–5–3(6)(B) uses the expression "removed from [the parents'] *custody* for six months." We infer this to mean physical custody.

■ In this case, physical custody of Shaun and Charles was returned to Glenda on February 28 and March 6 respectively. Approximately 2 months later, on May 2, she again lost physical custody of the boys. The petition to terminate parental rights was filed approximately one month later on June 8, obviously not in compliance with the six months provision.[4]

We also find insufficient evidence in the record that termination of Glenda's parental rights was in the children's best interests and that the county department has a satisfactory plan for the care and treatment of the children, as required by IC 31–6–5–4(4) and (5).

At the hearing held on September 27 and October 3, the testimony showed Glenda, who was 26 years old, had a great deal of difficulty coping with everyday problems and with caring for her children. She had an 8th grade education, was a highly emotional person who often went into fits of hysterical behavior especially when she did not get her way, and often exhibited a very hostile attitude to the numerous agencies that attempted to help her with her problems. Moreover, her actions and dependency on the Department were both highly disruptive of and taxing on the Department itself. During the two month period when Glenda had physical custody of the children prior to the hearing she was constantly seeking assistance from the Department in one way or another. Although the Department provided her with numerous services and traditional welfare subsidies, it was limited by its caseload as to the amount of time it could spend on one client.

This evidence certainly informs us that Glenda's ability to care for her children is highly suspect but that information alone is not dispositive of whether termination of her parental rights is in the best interest of the children. The word "best" connotes some type of comparison; it is a relative term. The record in this case provides us almost no evidence as to why it would be *best* for the children if their mother's parental rights are terminated.

The only evidence in the record that sheds any light on present and future placement alternatives is set out below:

In its Petition to Terminate Parental Rights the Department prayed for authority to consent to adoption of the children;

Yvonne Frank is the foster mother;

Glenda's caseworker had spoken to her about putting the children up for adoption;

In response to the question, "If the parental rights are terminated, I assume there would be placement then of the children in foster homes?" the case worker responded, "Yes."; and

In its judgment the court designated the Department as the agency to initiate adoption proceedings.

The record does not tell us who was to have physical custody of the children at the close of the hearing. If they were returned to Yvonne Frank, we are told nothing about her. While we would certainly expect the Department to utilize only well qualified persons as foster parents we have no evidence before us to make a comparison between Glenda and the foster parent(s) to

4. In fairness to the Department, it probably had no way of knowing on June 8 that the case would not be decided until after the new Juvenile Code went into effect on October 1, and therefore did not feel compelled to comply with the six month provision. On the other hand, IC 31–3–16(g)(7), which was not repealed until October 1, called for a 2 year period of custodial separation between the parent and child before adoption of the child could be carried out without the parent's consent. Although we are aware of the court's holding in *Matter of Perkins*, (1976) 170 Ind.App. 171, 352 N.E.2d 502, we note that subsection (7) was enacted after the date of the trial court's decision in that case and that the wording included in the subsection would seem to make it applicable to the facts we are dealing with in this case.

determine if it is in the children's best interest to be with the foster parent(s). We also are not presented with any evidence concerning the emotional needs, parental attachment, or intellectual and emotional development of the children. While it may not be good for the children to be living with their mother, or to allow her to retain her parental rights, unless we are furnished evidence that a better alternative is available, we cannot say in a vacuum that it was in the children's best interests to terminate Glenda's parental rights.

Lastly, the only evidence at the hearing as to a plan for care or treatment of the children was the caseworker's affirmative response to the Department's counsel's assumption that the boys would be placed in foster homes. This does not provide us sufficient evidence from which we can conclude the Department has a *plan* for the care and treatment of the children. While such a plan may well exist, or be easily drawn up, we are not presented with any evidence of it in the record. Additionally, the evidence discloses that one of the boys is a mulatto. Traditionally, child placement agencies have experienced difficulties in securing adoptive parents for children of mixed race. If such a difficulty should arise in this case we would like to know the Department's alternate plans.

We note that judgment was entered in this case on October 9, 1979, more than fifteen months ago. It was not fully briefed for us until more than thirteen months had elapsed since the judgment. In that judgment the trial court ordered that "no adoption proceedings be commenced until appellate review is exhausted on the state level or waived." Soon thereafter the court denied Glenda's motion for visitation. For fifteen months the children have not seen their mother and have not been eligible for adoption. This present state of limbo will be extended upon remand of this case. The longer we allow this limbolic situation to continue, the more possible damage we do to the children. In their work *Beyond the Best Interests of the*

*Child*, the authors implore us, when dealing with child placement cases, to be eternally cognizant of a child's sense of time, and the potential harmful effects of relatively short periods of time in children's lives when they lack the continuity of a permanent (as opposed to temporary) parent-child relationship.

"The courts, social agencies, and all the adults concerned with child placement must greatly reduce the time they take for decision. While the taking of time is often correctly equated with care, reasoned judgment, and the assurance of fairness, it often also reflects too large and burdensome caseloads or inefficiently deployed resources. Whatever the cause of the time-taking, the costs as well as the benefits of the delay to the child must be weighed. Our guideline would allow for no more delay than that required for reasoned judgment. By reasoned judgment we do not mean certainty of judgment. We mean no more than the most reasonable judgment that can be made within the time available—measured to accord with the child's sense of time. Therefore, to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the emergency that it is for the child. (Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.)" [5]

Keeping this imploration in mind, we strongly urge the state bar (including judges of all levels), the Welfare Department, and court personnel (including court reporters) to use their best efforts to see that child placement cases are prepared, heard, appealed if desired, and finalized as rapidly as possible.

Since Glenda has not appealed the denial of her Petition to Terminate Wardship, wardship of Charles and Shaun shall continue to be with the Department. The judgment of the trial court terminating Glenda's parental rights is reversed and this case is remanded for further proceedings.

YOUNG, P. J., and MILLER, J., concur.

5. *J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child*, 42 (1973).