In the Matter of Teanna Marie SNYDER, Tamala Michelle Snyder and Jason Neil Snyder, Minor Children Under The Age of Eighteen Years.

Kathleen SNYDER, Respondent-Appellant,

v.

SHELBY COUNTY DEPARTMENT OF PUBLIC WELFARE, Petitioner-Appellee.

No. 1–480A106.

Court of Appeals of Indiana, First District.

March 31, 1981.

Michael G. Ruppert, Legal Services Organization of Indiana, Inc., Indianapolis, for respondent-appellant.

Mark W. McNeely, McNeely & Sanders, Shelbyville, for petitioner-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Kathleen Snyder (Kathleen) appeals from a judgment entered in the Shelby Superior Court which terminated her parental rights regarding Teanna Snyder (Teanna), Tamala Snyder (Tamala), and Jason Snyder (Jason). Affirmed in part, reversed in part, and remanded with instructions.

## STATEMENT OF THE FACTS

In April of 1977, Kathleen was hospitalized, and Teanna, Tamala and Jason were made temporary wards of the Shelby Superior Court. These wardships were made permanent in May 1977 while Kathleen was temporarily committed to a mental health facility. Rosalie Shadley (Shadley), a Shelby County Department of Public Welfare (Department) caseworker, was assigned to supervise the wardships of Kathleen's children.

Kathleen was allowed a visit with her children in August of 1977 after she had been released from the hospital. In September, the Shelby County Superior Court entered an order requiring Kathleen to pay fifteen dollars ($15.00) per week in child support. She did not pay any support even though she was employed from November 1977 to February 1978 at the Marion County Home. However, during her November 1977 visit with her children, Kathleen gave her children hats, coats, and a birthday cake. Likewise, during her December visit with the children, she gave them gifts. Also, she was allowed to take the children out to dinner.

In January of 1978, Shadley felt that Kathleen had made sufficient progress to allow the children to be returned to her. However at the time, Kathleen was living with David Parks (Parks). Shadley informed Kathleen that her children would not be returned to her as long as Parks was still present; hence, Kathleen moved Parks out of her home. Teanna, Tamala, and Jason were returned to Kathleen on February 1, 1978. However, the children were returned to their foster home on February 3. During the two days that Kathleen had the children, Parks had threatened Kathleen and tried to get into her home. She did not want him near her children and asked Clay Collins to stay with her and the children. Parks called the Department to report that Kathleen was not taking adequate care of her children. Upon the basis of this report, Shadley went to Kathleen's home to find it in disarray. Shadley removed the children from Kathleen's care on that day with Kathleen's agreement that the children should be returned to their foster home.

Kathleen did not return to her job after the weekend of February 1. In March, she requested a visit with her children; however, Shadley believed that Kathleen was mentally or emotionally unstable and would not allow a visit unless she obtained a statement from a mental health professional stating that she was stable enough to visit her children. Kathleen contacted Jim Albrecht at the People's Mental Health Center in March, and he informed Kathleen that he could not give her a release without observing her interaction with her children. Albrecht told Shadley in March that Kathleen had asked for a release; however, Shadley stated that she did not understand until September that Kathleen would have to be observed with her children to obtain a release. Shadley never made any arrangement for an evaluation of Kathleen and her children; she did not feel it was her job to arrange the release.

From the end of March through June of 1978, Kathleen was incarcerated in the Mar-

ion County Jail. After her release, she was unemployed, except for a few weeks in August when she worked at a CETA job. In October, Kathleen began a full-time job at the Chaperral Restaurant in Shelbyville and a part-time job at Pizza Hut. She once again asked to visit with her children. This request, as with the ones she had made in August and September, was denied.

The Department filed a petition to terminate Kathleen's parental rights on October 10, 1978, alleging that Kathleen had failed without justifiable cause to communicate significantly with her children when able to do so and wilfully failed to support her children as required by law when able to do so for at least one year immediately prior to the filing of the petition. Kathleen was served with these papers on or about October 12, and she called the Department about them on that day. According to Kathleen, when she talked to June Himmel (Himmel), director of the Department, she was told that she was unfit, selfish, and could not give her children the love they needed. Further, she was informed that if she signed adoption papers she would not have to go to court. Himmel denied these statements. She stated that Kathleen was told the Department was acting in the children's best interests and that there were several reasons why the Department had filed the petition. Himmel suggested that Kathleen contact an attorney, which she did. However, Kathleen was unable to hire the attorney because she did not have any money. Approximately one week later, Kathleen went to the Department along with a neighbor, Carolyn Harris (Harris). On that day Kathleen signed a consent to adoption and a voluntary relinquishment of her parental rights to each of her children.

Kathleen filed a verified withdrawal of her consents to adoption of her children with the trial court on December 11, 1978, alleging that it would be in the best interests of her children to withdraw the consents. Also, she alleged that the consents to adoption were obtained as a result of duress and undue influence. The Department amended its petition on January 22, 1979, to reflect that Kathleen had voluntarily relinquished her parental rights and consented to adoption of her children. Trial was held on March 23, 1979, and Judge Tolen entered judgment on October 1, 1979, which states in pertinent part:

"The Court finds that for at least one year preceding the filing of the petition said mother has failed to provide for the support of said children when able to do so, and has failed without justifiable cause to communicate significantly with said children when able to do so.

"The Court further finds that the matters set forth in the Amended Petition herein are true; and that the consent to adoption and Voluntary Termination of Parental Rights concerning the minor children were signed freely and voluntary [sic] and in the best interest of the minor children.

"THE COURT FURTHER FINDS that reasonable services have, under the circumstances, been provided to Kathy Snyder or were offered and refused by Kathy Snyder. Said services were designed to aid Kathy Snyder in overcoming the problems which originally lead to the depreviation [sic] of the physical custody of the minor children. Despite the offer or utilization of the services, the problems which originally lead to the depreviation [sic] of physical custody are still present.

"THE COURT FURTHER FINDS that if the parental rights of the said minor children are terminated that said minor children will be placed for adoption.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the parent-child relationship existing between Kathy Snyder and her minor children, Teanna Marie Snyder, Tamala Michelle Snyder, and Jason Neil Snyder, are terminated and all legal rights of inheritance between said minor children and their mother are further hereby terminated, without any further act or proceedings; and that by reason of said children being presently wards of the Shelby Superior Court, no guardian or custodian shall be appointed; and the custody and supervision of said children

shall remain with the Shelby County Department of Public Welfare."

## ISSUES

The following issues have been raised by Kathleen for our consideration:

1. Whether the trial court erred as a matter of law in denying Kathleen discovery of the caseworker's notes on the basis that the notes were protected from discovery by the work product immunity.

2. Whether the trial court's finding that the consents to adoption and voluntary relinquishment of parental rights were voluntarily signed is contrary to law.

3. Whether the trial court erred by failing to order the withdrawal of the consents to adoption and voluntary relinquishment of parental rights.

4. Whether the trial court's finding that Kathleen failed without justifiable cause to communicate significantly with her children when able to do so during one year preceding the filing of the petition to terminate parental rights is contrary to law.

5. Whether the trial court's finding that Kathleen failed to provide for the support of her children when able to do so for one year immediately preceding the filing of the petition to terminate parental rights is contrary to law.

6. Whether the trial court's finding that Department provided reasonable services to Kathleen is contrary to law.

## DECISION

Before discussing the merits of this case, we must first decide what law is applicable since judgment was entered on October 1, 1979. Is the applicable law Ind.Code 31–3–1–7 (repealed 1979) or Ind.Code 31–6–5–4 of the new Juvenile Code[1] which was effective October 1, 1979? The effective date of October 1, 1979, of the new Juvenile Code does not apply to "matters in which a court has entered a dispositional decree before October 1, 1979, except that a person authorized to move for a modification of judg-

ment may petition the court to apply this act in such a matter." Acts of 1978, P.L. No. 136, § 59.

In the recent case of *In the Matter of Charles Damon Miedl,* (1981) Ind.App., 416 N.E.2d 491, this court was faced with the issue of which statute to apply to a termination of parental rights proceeding. Glenda Miedl's two children were made wards of the County Welfare Department in August of 1976 and May of 1978. A petition to terminate her parental rights was filed on June 8, 1979. The hearing on this petition was held on September 27 and October 3, 1979, and judgment was entered on October 9, 1979. On appeal, Glenda Miedl argued that the new Juvenile Code should not apply since the wardships were awarded by entering a dispositional decree prior to October 1, 1979. This court in holding that the new Juvenile Code applied to the termination proceedings stated at 416 N.E.2d at 493:

"Glenda reads the word 'matters' contained in § 59 as being synonymous with the words 'case' or 'cause' and cites *Malone v. Conner,* (1963) 135 Ind.App. 167, 189 N.E.2d 590, for the rule that statutes are to be construed as having a prospective operation unless the language employed clearly indicates the statutes were intended to be retrospective. While we agree with the basic rule cited, we disagree with her interpretation given to the word 'matters.'

"If we interpreted 'matters' as suggested by Glenda we would reach an absurd result. Under Glenda's interpretation, if a parent had 2 children, and one was made a ward of the Department before October 1, 1979, and the other after that date, then those two similarly situated children would be treated under two different groups of laws, i. e. the statutes repealed October 1, 1979, and the new Juvenile Code. Additionally, depending on the ages of the two similarly situated children, this dissimilar treatment under the law may continue for several years until they reach the age of majority. It cannot be assumed the legislature expects

1. Ind.Code 31–6–1–1 *et seq.*

its enactments to be applied in an absurd manner. *Pryor v. State*, (1973) 260 Ind. 408, 296 N.E.2d 125.

\* \* \* \* \* \*

"As applied to the facts in this case, making the children wards of the Department was a 'matter' to which the new Juvenile Code did not apply. The termination of Glenda's parental rights is another 'matter,' in which the court had not entered a disposition decree before October 1, 1979. Therefore, IC 31–6–5–4 applied to the latter proceeding."

We find *Miedl* readily distinguishable from the case at hand. In *Miedl*, the hearing on the petition was held both before and *after* the effective date of the new Juvenile Code.[2] In addition the trial court's order was entered on October 9, 1979. However, in the present case the hearing on the termination petition was held on March 23, 1979. It would be unreasonable for us to apply the new Juvenile Code on appeal because the judgment was entered on October 1, 1979, when both parties and the trial court proceeded entirely under the old law. Therefore, we will apply IC 31–3–1–7 (repealed 1979) and IC 31–3–1–6 to the present case.

*Issue One*

During the course of the proceedings in the present case, Kathleen sought discovery of Shadley's notes which were made prior to the initiation of the termination proceeding. Kathleen stated that the consents were signed as a result of undue influence. She alleged that every time she spoke with Shadley after February of 1978 Shadley would ask her to give up her children and inform her that she was unfit and selfish. Since Shadley denied Kathleen's allegations, Kathleen sought to discover Shadley's casenotes to determine whether they would corroborate her allegations. The trial court denied Kathleen's motion. The trial judge ruled that the notes were work product and thus exempt from discovery unless Shadley used them in her testimony, which she did not do. Kathleen alleges the trial court's ruling was erroneous because the caseworker's notes were prepared in the ordinary course of business and thus are subject to discovery.

When ruling on a party's motion to compel discovery, the trial court must determine whether the information sought is relevant to the issues to be tried and if it is protected from discovery by a privilege or immunity.[3] *Newton v. Yates*, (1976) 170

2. Similarly in the recent case of *In the Matter of Benjamin Kirk Myers*, 417 N.E.2d 926 (1981) Ind.App., 417 N.E.2d 926, in which we held that the new Juvenile Code was applicable, the hearing on the petition was held on December 3, 1979, and the Court's order was entered on December 11, 1979.

3. The scope of discovery is governed by Ind. Rules of Procedure, Trial Rule 26(B), which states in part:
    "(B) Scope of discovery. Unless otherwise ordered by the court in accordance with these rules, the scope of discovery is as follows:
    "(1) In general. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objec-

tion that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
    "(2) Trial preparation: Materials. Subject to the provisions of subdivision (B)(1) and (3) of this rule, a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor, except that a statement concerned the action or its subject-matter previously given by the party seeking the statement may be obtained without such a showing. A statement of a party is
    (a) a written statement signed or otherwise adopted or approved by the party, or
    (b) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement which was made by the party and contemporaneously recorded."

Ind.App. 486, 353 N.E.2d 485, *trans. den.* Since Indiana does not have a privilege which applies to caseworkers and Kathleen clearly showed the relevance of the caseworker's notes, we turn to the issue of whether they are protected from discovery under T.R. 26(B)(2) unless good cause is shown.

The Department contends Kathleen has waived any issue of discovery because she failed to return to the trial court after deposing Shadley and show cause for any further discovery.[4] We will not address this contention unless the caseworker's notes were prepared in anticipation of litigation, for only then must good cause be shown.

The work product immunity originally developed from the case of *Hickman v. Taylor*, (1947) 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451, in which the Supreme Court recognized a qualified privilege for an attorney's work product. This privilege was extended to include attorneys' agents. *Alltmont v. United States*, (3d Cir. 1949) 177 F.2d 971. However, this immunity does not extend to documents prepared in the regular course of business rather than for purposes of litigation. *Goosman v. A. Duie Pyle, Inc.*, (4th Cir. 1963) 320 F.2d 45; *Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.*, (N.D.Ga.1972) 61 F.R.D. 115; Civil Code Study Commission Comments, 2 W. Harvey, Indiana Practice at 461 (1970). The determination of the purpose for which a document is prepared is often a difficult one. As Judge Sharp stated in *Galambus v. Consolidated Freightways Corp.*, (N.D.Ind. 1974) 64 F.R.D. 468, 472:

> "The authorities indicate that prudent parties anticipate litigation and often begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in the light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the pros-

pect of litigation. Conversely, even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation."

In addressing the issue of whether the caseworker's notes are prepared in anticipation of litigation, the Department asserts, "[f]urther, since all the caseworkers' notes were prepared in anticipation of litigation and certainly the caseworker has to be considered an agent or client of the attorney for the Shelby County Department of Public Welfare. [sic] Appellees feel that the 'work product immunity' law applies." (Brief, at 45.) We disagree with the Department's assertion which was not supported by citation to case law or to facts in the record.

■ Arguably, litigation for the purpose of terminating a parent's rights could occur at some time in any child wardship case. However, it is just as likely that the children would be returned to their parents without any litigation, especially in light of the policy of this state to strengthen the family unit by assisting parents in the fulfillment of their parental obligations. Ind. Code 31–3–1–7(e)(4) (repealed 1979). Therefore, an assertion that records in wardship cases are kept for purposes of litigation even though litigation has not been pursued is untenable. Furthermore, Shadley testified that one of her duties as a caseworker supervising a wardship is to keep records of the contacts with the parents. This is the only evidence in the record which reflects upon whether a caseworker's notes are prepared in anticipation of litigation or in the regular course of business. Since the trial court's ruling was "clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom," *Marshall v.*

---

4. At the hearing on the motion to compel discovery, Kathleen also was seeking to depose Shadley. It was at this time that the trial court ruled her notes were work product and could

not be discovered unless she used them during her testimony at the deposition, which she did not do.

*Reeves,* (1974) 262 Ind. 107, 115, 311 N.E.2d 807, 812, 262 Ind. 403, 316 N.E.2d 828, we hold that the trial court abused its discretion in ruling that the caseworker's notes were not subject to discovery.

However, we will not reverse a judgment when the erroneous ruling of the trial court does not affect the outcome of the case or substantially affect the rights of the appellant. Ind. Rules of Procedure, Trial Rule 61. In the present case, we are unable to determine what effect the trial court's ruling had upon the outcome of this case since the contents of the caseworker's notes are unknown. If Shadley's notes uphold Kathleen's contention that she was repeatedly told she was unfit and should give up her children, then the outcome of this case could be different on the issue of undue influence. However, if Shadley's notes are consistent with her testimony, then no new evidence will be forthcoming on the issue of undue influence and the trial court should be upheld as discussed in Issue Two. Therefore, we remand to the trial court with instructions that the caseworker's notes be produced for inspection by the court and plaintiff's counsel to ascertain whether any discrepancies exist between the notes and Shadley's testimony which go to the issue of undue influence.[5] If such discrepancies are found, a new trial must be granted to Kathleen on the issue of undue influence. However, if there are no discrepancies, then the trial court is affirmed on the issue of whether the consents to adoption and voluntary termination of parental rights were freely and voluntarily given as discussed in Issue Two.

5. Remand for this purpose is supported by *U. S. v. Johnson,* (5th Cir. 1972) 465 F.2d 793; *Goosman v. A. Duie Pyle, Inc.,* (4th Cir. 1963) 320 F.2d 45; Ind. Rules of Procedure, Appellate Rule 15(N). *See also, Atkinson v. State,* (1979) Ind.App., 391 N.E.2d 1170, 411 N.E.2d 651 (1980), *trans. den.*

6. The contention that the consents were signed as a result of undue influence is an affirmative defense which must be specially pleaded. *In re Adoption of Hewitt,* (1979) Ind.App., 396 N.E.2d 938; Ind. Rules of Procedure, Trial Rule 8(C). Kathleen in her Verified Petition to

*Issue Two*

Kathleen challenges the trial court's judgment that she voluntarily signed the consents to adoption and voluntary relinquishment of her parental rights as being contrary to law. She contends the facts and circumstances can lead but to one conclusion and that is the consents were signed as a result of undue influence.[6]

The Department alleges that Kathleen has waived this issue because she did not object to the admission of the consents into evidence. Unfortunately the Department has failed to enlighten us on how a failure to object to the admission of the written consents can constitute a waiver of an affirmative defense, and we find such an argument without merit. Kathleen has adequately preserved her affirmative defense. She raised the defense as to the consents to adoption in her Verified Petition to Withdraw her Consents. Furthermore, she contended in her Answer to the Department's Amended Petition, in her Answers to Interrogatories, and in the Response to the Department's Request for Admissions that the consents to adoption and relinquishment of her parental rights were executed as a result of undue influence. Also, she introduced evidence to that effect. We fail to understand how Kathleen waived her affirmative defense when she consistently asserted it throughout the proceedings.

Now we turn to Kathleen's contention that the trial court's judgment is contrary to law. The issue of an invalid consent is an affirmative defense to a facially valid consent upon which Kathleen had the burden of proof. *In re Adoption of Hewitt,* (1979) Ind.App., 396 N.E.2d 938. Therefore,

Withdraw Consents only alleged that the consents to adoption had been procured by undue influence. She did not raise the defense as to her voluntary relinquishment of her parental rights. Nonetheless, the issue was properly before the trial court because of the failure of the Department to object to evidence relating to it. *AAA Wrecking v. Barton, Curle & McLaren, Inc.,* (1979) Ind.App., 395 N.E.2d 343, *trans. den.; Homemakers Finance Service, Inc. v. Ellsworth,* (1978) Ind.App., 380 N.E.2d 1285, *trans. den.;* Ind. Rules of Procedure, Trial Rule 15(B).

we will reverse the trial court only if the evidence at trial led to but one conclusion and the trial court reached an opposite conclusion. *Roberts v. Wabash Life Insurance Co.*, (1980) Ind.App., 410 N.E.2d 1377; *Hewitt, supra.*

Undue influence has been said to exist when "through weakness, ignorance, dependency or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the former from exercising an unbiased judgment." *Hill v. Jessup*, (1966) 139 Ind.App. 467, 471, 220 N.E.2d 662, 665. The essence of undue influence is the destruction of the free agency of the one who is subject to it. However, the person who is exerting the undue influence need not be present at the time of the execution of the document if the undue influence still persists. *McCartney v. Rex*, (1957) 127 Ind.App. 702, 145 N.E.2d 400. Whether there was undue influence in any case depends upon the facts and circumstances of the particular case. *McCartney, supra.*

The evidence in the record regarding undue influence is conflicting. Kathleen contends that after February of 1978 she was not allowed to see her children and was told by the Department's employees she was unfit, selfish, and should give up her children. When she was served with the petition to terminate her parental rights, she was confused since it said that she had not supported or communicated with her children for one year. Kathleen felt that these were lies and did not want to go to court. She contends that when she called the Department for an explanation of the petition, she was told once again that she was unfit and selfish. When Kathleen asked how she could avoid going to court, she was told, according to her testimony, that she could sign consents to adoption. The only recollection Kathleen had of the signing of the consents was that one of the Department employees laughed at her and commented that they, the Department, never thought Kathleen would sign the consents.

The testimony of the employees of the Department is directly in conflict with Kathleen's testimony. Himmel and Shadley denied that they told Kathleen she was unfit and should give up her children. Further, Himmel testified that there was never any mention of consents to adoption made to Kathleen, and that when Kathleen signed the consents she was talking coherently and thinking clearly. Kathleen was asked if she was certain that the signing of the consents was what she wanted, to which she replied affirmatively.

Harris, the neighbor who accompanied Kathleen to the Department when she signed the consents, testified that Kathleen knew what she was doing. However, Harris felt that Kathleen did not realize the permanency of her action. Harris did remember Himmel's remark that she did not think they, the Department, would ever get Kathleen to sign the papers.

■ We cannot say that this conflicting evidence leads only to the conclusion of undue influence without reweighing the evidence and assessing the credibility of the witnesses, which we will not do. The trial court did not err in its judgment that the consents were voluntarily signed.

*Issue Three*

■ Pursuant to IC 31–3–1–6(f),[7] Kathleen filed a petition to withdraw her consents to adoption alleging, in part, that such action would be in the best interests of her children. She contends the trial court's decision disallowing the withdrawal of her consents to adoption of her children and her voluntary relinquishment of parental rights is contrary to law because she timely and adequately exercised her statutory right to withdraw them.

7. IC 31–3–1–6(f) provides:
"(f) A consent to adoption cannot be withdrawn after the entry of the decree of adoption. A consent to adoption may not be withdrawn prior to the entry of the decree of adoption unless the court finds, after notice and opportunity to be heard afforded to the petitioner, the person seeking the withdrawal is acting in the best interest of the person sought to be adopted and the court orders the withdrawal."

IC 31–3–1–6(f) does provide for the withdrawal of consents to adoption prior to the entry of a decree of adoption. However, IC 31–3–1–7 (repealed 1979) does not contain a provision for withdrawal of a voluntary relinquishment of parental rights which was executed pursuant to IC 31–3–1–7(b) (repealed 1979).[8] Therefore, it is necessary for us to determine whether a parent can withdraw his or her voluntary relinquishment of parental rights notwithstanding the absence of a statutory provision allowing it. We think not.

In *Rhodes v. Shirley*, (1955) 234 Ind. 587, 129 N.E.2d 60, our Supreme Court was presented with the issue of whether natural parents had the absolute right to revoke their consent at any time prior to the decree of adoption. The then applicable statute, Section 3–120, Burns' 1946 Replacement, did not contain any provision for revocation of consents to adoption. The appellant argued that a right to revocation was implied by statute. The Supreme Court disagreed and stated:

> "We do not construe our statutes as implying an intention that natural parents, having consented to the adoption of their children, have a right to arbitrarily revoke that consent at any time prior to the final decree of adoption. Neither does reason dictate such a rule. On the contrary, if such a rule were followed there would be no purpose in obtaining a consent prior to the placement of children and the subsequent supervisory period, all of which, under our procedure, ordinarily precedes the actual adoption proceedings."

234 Ind. at 596, 129 N.E.2d at 64.

Although *Rhodes* did involve a consent to adoption and was a case where the natural parents were intervening in the adoption proceedings, we find the rationale of *Rhodes* to be applicable to the present case. If a natural parent were allowed to arbitrarily withdraw his or her voluntary relinquishment of parental rights, then adoption of the child would be discouraged. Few prospective parents would want to start the lengthy process of adoption when there is a possibility that the natural parent would withdraw his or her relinquishment of parental rights, thus ending the adoption proceedings. A ruling allowing the arbitrary withdrawal of a voluntary relinquishment of parental rights "would subject every adoptive parent and child to the possibility of a most cruel and emotional turmoil, and because of this fact it would make adoptive parents the ready prey of possible unscrupulous parents." *Id.*, 234 Ind. at 597, 129 N.E.2d at 65. Therefore, a parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors.

We have already upheld the trial court's decision, subject to our instructions for remand, that Kathleen voluntarily signed the relinquishment of her parental rights in Issue Two. Since a relinquishment of parental rights includes the relinquishment of the right to control or consent to adoption, IC 31–3–1–7(a)–(b) (repealed 1979), we need not discuss further the issue of whether Kathleen could withdraw her consents to adoption.

### Issues Four and Five

In addition to alleging that Kathleen voluntarily relinquished her rights, the Department alleged she had failed without justifiable cause to significantly communicate with her children and to provide for the

---

**8.** IC 31–3–1–7(b) (repealed 1979) provides in pertinent part:

> "(b) All rights of a parent with reference to a child, including parental right to control or consent to an adoption or to receive notice of a hearing on a petition for adoption, may be relinquished and transferred to a licensed child-placing agency or county department of public welfare, by a writing (1) signed by the parent in the presence of a representative of an agency or county department to whom custody of the child is transferred and in the presence of a notary public or other person authorized to take acknowledgments; or (2) signed by the parent in the presence and with the approval of a judge of a court of record of the jurisdiction within or without this state in which the minor is present or in which the parent resided at the time it is signed."

support of her children when able to do so during one year preceding the filing of the petition to terminate her parental rights.[9] The trial court made specific findings of fact that these averments were true and terminated Kathleen's parental rights. Kathleen contends the trial court's findings are contrary to law and the facts. The Department correctly asserts that only one of the statutory criteria need be proved to affirm the judgment. If one statutory criterion is established by clear, cogent, and indubitable evidence, we will affirm the judgment. *In re Leckrone*, (1980) Ind.App., 413 N.E.2d 977; *In re Adoption of Lockmondy*, (1976) 168 Ind.App. 563, 343 N.E.2d 793.

■ Kathleen asserts she did communicate with her children from October 1977 to October 1978. Specifically, she refers us to the uncontroverted evidence that she visited with her children in November and December of 1977; that the children were with her for three days in February of 1978; and that although she did not see her children after February of 1978, she requested visits with them in August, September, and October of 1978. The Department states that Kathleen did not *significantly* communicate with her children because "Appellant was so emotionally and mentally disturbed that any communication with the children was detrimental to their best interests." (Brief, at 38.) We disagree. We find Kathleen's visits with her children in November and December of 1977 and February of 1978 were meaningful. This is not a case where the only communication between Kathleen and her children was an occasional card or letter. *In re Johnson*, (1981) Ind.App., 415 N.E.2d 108; *In re Adoption of Dove*, (1977) Ind. App., 368 N.E.2d 6, 371 N.E.2d 387 (1978),

*trans. den.* Kathleen visited her children when allowed to do so by the Department. Further, she brought them gifts and clothes, and they were anxious to be reunited with her. Although the return of the children to Kathleen in February of 1978 was not successful, it was, nonetheless, significant communication with her children. The Department failed to prove by clear, cogent, and indubitable evidence this statutory criterion.

We turn now to whether there is clear, cogent, and indubitable evidence that Kathleen wilfully failed to support her children when able to do so as required by law or judicial decree for one year preceding the filing of the Department's petition. Kathleen concedes that in September of 1977 a court order was entered which required her to pay support. She also concedes that she did not pay any money to the court. However, she asserts her failure to pay support from September of 1977 to February of 1978 was not wilful as evinced by her gifts to the children and her preparations for their return to her home. Further, she contends she was unable to pay support from February of 1978 until September because she was either incarcerated or unemployed. The Department does not address Kathleen's contentions, but instead relies upon the fact that Kathleen paid no support to the court.

In the recent case of *Young v. Young*, (1977) Ind.App., 366 N.E.2d 216, *trans. den.*, this court addressed the problem of whether a mother had wilfully failed to support her children. The first Mrs. Young had been ordered by the trial court to pay five dollars per week in support for her children. However, from the time of her divorce in 1971 until August 5, 1974, when the second Mrs.

---

**9.** In order to terminate parental rights under IC 31–3–1–7 (repealed 1979), the statutory criteria set out in IC 31–3–1–6(g) must be proved by clear, cogent, and indubitable evidence. *In re Adoption of Lockmondy*, (1976) 168 Ind.App. 563, 343 N.E.2d 793. IC 31–3–1–6(g)(1) provides:

"(g) Consent to adoption is not required of: (1) a parent or parents if the child is adjudged to have been abandoned or deserted

for six [6] months or more immediately preceding the date of the filing of the petition; or a parent of a child in the custody of another person, if for a period of at least one [1] year he fails without justifiable cause, to communicate significantly with the child when able to do so or he wilfully fails to provide for the care and support of the child when able to do so as required by law or judicial decree."

Young filed her Petition for Adoption, the first Mrs. Young made only one fifty dollar support payment. She had visited the children, played with them, and bought them gifts. The trial court found that the first Mrs. Young had wilfully failed to support her children. This court in reversing the trial court cited the case of *In re Baker's Adoption*, (1955) 100 Ohio App. 146, 136 N.E.2d 147, which specifically discussed the meaning of wilful failure to support in an analogous situation to that in *Young*. The Ohio Appellate Court held that a mere failure to pay support does not constitute a wilful failure to support, for wilful means intentional, voluntary, or not accidental. We agree and hold that the Department has failed to prove by clear, cogent, and indubitable evidence that Kathleen wilfully failed to support her children. She visited them when allowed to do so. The evidence is uncontroverted that she took them gifts, winter coats, and had a birthday party for them. On the basis of the facts before us, Kathleen's failure to support was not wilful. Furthermore, for a period of four and one-half months, from the end of March to August of 1978, she was unable to support her children because she was either incarcerated or unemployed.

Since the Department failed to prove that Kathleen had either failed to significantly communicate with her children or wilfully failed to support them, the trial court's order terminating Kathleen's parental rights upon these bases is reversed.

*Issue Six*

Since the Department failed to prove the statutory criteria for the termination of Kathleen's parental rights, we need not discuss this issue.

This case is reversed in part and remanded for further proceeding consistent with our opinion. If the examination of Shadley's casenotes upon remand does not shed any new light on the issue of undue influence, then the trial court's judgment that Kathleen voluntarily relinquished her parental rights is affirmed. On the other hand, if such notes reveal significant dis-crepancies between Shadley's notes and her testimony bearing upon the question of undue influence in procuring the consents, a new trial should be granted.

NEAL, P. J., and ROBERTSON, J., concur.