Angelic Maria BELL, Appellant,

v.

In the Matter of the ADOPTION OF: A.R.H., S.A.H., D.L.H., and L.A.H., Mr. and Mrs. Doe, Appellees.

No. 49A04–9411–CV–454.

Court of Appeals of Indiana.

Aug. 3, 1995.

Mark Small, Swetnam & Small, Indianapolis, for appellant.

Michael A. Wilkins, Ice Miller Donadio & Ryan, Indianapolis, Linda Walker Thrapp, Indianapolis, for appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Angelic Bell appeals the denial of her petition to withdraw her consents to adoption. We affirm.

### ISSUE

Whether the trial court erred in denying Bell's petition to withdraw her consents to adoption.

### FACTS

In early August of 1993, 23 year-old Angelic Bell contacted Katrina Carlisle at the Coleman Adoption Agency to inquire about plac-

ing her four oldest children for adoption.[1] Bell explained that she wanted to place the children for adoption because she was neither emotionally nor financially able to care for them. Further, Bell told Carlisle that she had been thinking of placing her children for adoption for at least a year.

On August 17, 1993, Bell met with Carlisle; Pam Allen, another Coleman employee; and Mr. and Mrs. Doe, the prospective adoptive parents. During the meeting, which lasted approximately two and one half to three hours, Bell and the Does discussed the reasons that Bell wanted to place the children for adoption. Mrs. Doe testified that when she left the meeting, it was her understanding that Bell had made a firm decision about placing her children in a permanent adoptive home. Mr. Doe testified that Bell had convinced the Does "without a shadow of a doubt that she no longer wanted the children." (R. 289).

On August 19, 1993, Carlisle and Allen met with Donald Hinton, the children's biological father. Hinton signed consents to adoption for all four children. The next day, Friday, August 20, 1993, Bell returned to Coleman with her four children. Bell signed four documents in the presence of Carlisle and Allen. Before Bell signed the documents, Carlisle read and explained each one to her. The first document was a parental affidavit, which provided in pertinent part as follows:

I have read the Consent to Adoption Form.

The form has been explained to me by a representative of the agency.

I understand what the consent form says.

I understand that signing the consent form is a final act and that after signing, I cannot change my mind and cancel or revoke the consent.

All of my questions concerning the consent form and its significance and any other aspects of adoption and adoption procedures have been answered to my satisfaction.

I am not under the influence of any drugs, alcohol or medication which would impair my capacity to make an informed decision about my adoption plan.

No one has threatened or coerced me or made promises to me to encourage me to consent to the adoption of my child.

(R. 66). Bell checked the word "yes" after each statement and signed the document.

Bell also signed two affidavits, one naming the father of the children, and the other approving the children's placement. The second affidavit provided that Bell's "consent was freely and voluntarily given to this adoption." (R. 139). The final document was an authorization for the children's medical treatment.

After Bell had signed all of the papers, Carlisle drove Bell to the City–County Building where Bell signed two consents to adoption for each child. Each consent provided as follows:

### CONSENT TO ADOPTION

### ANGELIC MARIA BELL

the undersigned, being the parent and being 23 years of age, hereby consents to the adoption of [name of child] born on [date of birth]. By signing this consent, I hereby waive notice of hearing and opportunity to file objection with respect to the above named child. This consent was voluntarily executed by me without coercion or duress and without disclosure of the names or other identification of the adopting parents.

(R. 5–13). Bell signed the consents in the presence of both Carlisle and Commissioner William Fatout of the Marion Superior Court, Probate Division. Carlisle read the consents to Bell before Bell signed them, and Commissioner Fatout testified that he always follows the following procedure:

I make reference to Indiana Code ... 31–6–5–3 and I, in fact, keep a copy of that

---

1. At the time, Bell had five children—six year-old D.H., five year-old L.H., three year-old A.H., two year-old S.H., and one year-old L.H., Jr. Bell had had previous contacts with Coleman. In 1992, Bell contacted Coleman about the possibil-

ity of placing L.H., Jr. for adoption. In late 1990, Bell contacted Coleman about the possibility of placing S.H. for adoption. Neither of Bell's previous contacts with Coleman resulted in Bell placing her children for adoption.

particular statute in my desk drawer. When I'm asked to witness a consent to adoption, I get that out and I go through the rights that are contained in that section and advise the natural parent of those rights ascertaining, after I describe each right, that the natural parent understands the right and at the conclusion of the advising of rights, I ask them do they mean to consent to the adoption of their child and if they do—if they agree to that, I ask them to sign the form and after they have signed the form, I sign an acknowledgment.

(R. 245). After Bell had signed all of the papers, she left her children at Coleman. The children were placed with the Does that same day.

Bell testified that she telephoned Coleman on Monday, August 23, and told Carlisle that she wanted her children returned to her. Carlisle acknowledges receiving a telephone call from Bell, but she denies that Bell requested the return of her children.

Seven months later, on March 21, 1994, Bell filed a Petition to Withdraw Consent to the adoptions. The trial court denied Bell's petition on July 20, 1994, and the adoptions were finalized on July 22, 1994. Bell now appeals the denial of her petition to withdraw her consents. She argues that: 1) her consent was not voluntary, and 2) it would be in the best interests of her children to permit her to withdraw her consent.

## DECISION

As a reviewing court, we will not disturb the trial court's decision in an adoption proceeding unless the evidence at trial leads to but one conclusion, and the trial court reached the opposite conclusion. *Williams v. Townsend* (1994), Ind.App., 629 N.E.2d 252, 253. We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision. *Matter of Adoption of Marcum* (1982), Ind.App., 436 N.E.2d 102, 103. Further, we will not assess the credibility of witnesses. *In re Adoption of M.J.C.* (1992), Ind.App., 590 N.E.2d 1095, 1101.

### A. *Consent*

Bell claims that her consent was not voluntary. Specifically, Bell contends that she "made her decision . . . as a result of undue influence and, further, . . . she was unaware of the facts involved as to adoption." Bell's Brief, p. 11. We disagree.

Ind.Code 31–3–1–6 provides in pertinent part as follows:

(a) [A] petition to adopt a child under eighteen (18) years of age may be granted only if written consent to adoption has been executed by: . . .

(2) The mother of a child born out of wedlock and the father of a child whose paternity has been established by a court proceeding other than the adoption proceeding, except as provided in IC 31–66.1–2(e).

For the execution of the parent's consent to be valid, the consent must be voluntary. *Matter of Adoption of Topel* (1991), Ind.App., 571 N.E.2d 1295, 1298. A parent's consent to an adoption is voluntary if it is an act of the parent's own volition, free from duress, fraud, or any other consent-vitiating factor, and if it is made with knowledge of the essential facts. *Id.* The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner. *Id.*

Bell argues that her consent was involuntary and invalid because she was grief-stricken and "devastated by the death of her grandmother." Bell's Brief, p. 12. Bell's argument must fail.

In *Matter of Adoption of Hewitt* (1979), Ind.App., 396 N.E.2d 938, a mother petitioned to withdraw her consent to adoption. She argued that her consent was involuntary and invalid because: 1) it was executed two days after the birth of her child, 2) during her pregnancy she was abandoned and ostracized by her family, 3) she did not consult with her own attorney, and 4) her doctor had advised her that he thought that she had six months to change her mind, but she should talk to an attorney about it. The trial court denied the mother's petition. We affirmed and stated that "emotion, tensions, and pressure are . . . insufficient to void a consent

unless they rise to the level of overcoming one's volition."

■ Here, Bell has directed us to no evidence that her grief over her grandmother's death rose to the level of overcoming her volition. Rather, our review of the record reveals three stages of Bell's voluntariness in consenting. First, Bell told Carlisle that she had been thinking of placing her children for adoption for the past year because she was neither emotionally nor financially able to care for them. Then, Bell spent two and one half to three hours with the prospective adoptive parents before she signed the consents to adoption. Finally, the day after she met with the adoptive parents, Bell signed the consents to adoption and left her children at Coleman. We find no evidence that Bell's consent was executed under duress, fraud, or other consent-vitiating factors. Rather, the evidence reveals that Bell's consent was voluntary.

Bell further argues that her consent was invalid because she lacked knowledge of the essential facts. Specifically, Bell argues that she "was under the impression that she had a 'grace period.'" Bell's Brief, p. 13. In support of her argument, Bell directs us to *Topel, supra,* wherein the biological father executed a visitation agreement contemporaneously with his consent to adoption. The visitation agreement provided that Topel had "guaranteed visitation with [his son] every other weekend." *Id.* at 1297. Six months later, the adoptive parents informed Topel that the visitation arrangement was not working out. They further told Topel that he could either: 1) get his son back for $3,000.00 as reimbursement for the expenses which they had incurred in caring for the child, or 2) proceed with the adoption and forgo visitation with his son. Topel filed a petition to withdraw his consent to the adoption, and the trial court denied it. This court found that Topel had not been aware of all the essential facts involved in giving his consent to the adoption. Specifically, we found that it was obvious that Topel had not been aware that his consent to adoption would terminate his legal right to see his son. We reversed the trial court because the evidence led unerringly to a conclusion opposite the one reached by the trial court.

However, *Topel* is distinguishable from the facts before us. Although Bell testified that she was under the impression that she had a two week grace period, there was no such written evidence. Further, Carlisle testified as follows:

> I made it very clear to [Bell] that we do not have any period of time that she could change her mind once a consent is signed. I make that clear from the very first conversation I have with a client over the phone that the most important thing for a client to remember is that she should never sign adoption consents until she's absolutely certain in her mind that this is a definite plan that she wants to proceed with because once the consents are signed, they are final.

(R. 67–68).

■ In addition, the documents that Bell signed refute Bell's claim of a grace period. For example, the Consent to Adoption Form provided that Bell "waived an opportunity to file an objection ... by signing this consent." (R. 5). Further, Bell indicated on the parental affidavit that she understood that signing the consent form was a final act, and that she could not "change [her] mind and cancel or revoke the consent ... after signing." Our review of the record reveals that the evidence does not lead unerringly to a conclusion opposite the one reached by the trial court, and we decline Bell's invitation to reweigh the evidence and assess the credibility of witnesses.

### B. *Best Interests*

■ Bell further argues that the trial court erred in failing to find that it is in the best interests of Bell's children to permit Bell to withdraw her consent. We disagree.

Ind.Code 31–3–1–6(h) provides in pertinent part as follows:

> A consent to adoption may not be withdrawn prior to the entry of the decree of adoption unless the court finds, after notice and opportunity to be heard afforded to the petitioner, the person seeking to withdraw is acting in the best interests of

the person sought to be adopted and the court orders the withdrawal.

When a mother petitions to withdraw her consent to the adoption of her child, the mother has the burden of establishing that she is acting in the best interests of the child. *Matter of Adoption of Johnson* (1993), Ind. App., 612 N.E.2d 569, 573, *trans. denied.*

Bell appears to argue that she met her burden of proof because no one said "anything negative" about her, and all of her witnesses testified that she was "a good mother who loves her children." Bell's Brief, p. 15. However, Bell misunderstands her burden.

In *Rhodes v. Shirley* (1955), Ind., 234 Ind. 587, 129 N.E.2d 60, our supreme court held that natural parents do not have an absolute right to revoke their consent to adopt at any time prior to the decree of adoption. In so holding, our supreme court stated as follows:

> We do not construe our statutes as implying an intention that natural parents, having consented to the adoption of their children, have a right to arbitrarily revoke that consent at any time prior to the final decree of adoption. Neither does reason indicate such a rule. On the contrary, if such a rule were followed there would be no purpose in obtaining a consent prior to the placement of children and the subsequent supervisory period, all of which, under our procedure, ordinarily precedes the actual adoption proceedings.

*Id.* at 577.

In *Hewitt, supra,* the mother executed a consent to adoption two days after her child was born. The adopting parents filed a petition to adopt, and received temporary custody of the child. Ten days later, the natural mother filed a petition to withdraw her consent claiming a change in circumstances and, as the natural mother, a better ability to raise the child. The trial court denied the mother's petition, and she appealed. We affirmed the trial court, and stated as follows:

> The trial judge must recognize there are three parties whose interests and feelings are involved in the adoption process and all must be treated fairly. That judge must balance the interest of the natural parents and their sacred relationship to their child against the hope, expectation, reliances, and desires of the adoptive parents—all against the best interest of the child which, after all, rules supreme.
>
> The trial court had evidence before it as to the present circumstance of the Natural Mother and the Adoptive Parents. The trial judge also had the opportunity to observe and judge the credibility, demeanor, and maturity of these respective parties. Upon his shoulders fell the awesome responsibility of determining what was, in fact, in the best interest of the child. We do not disturb the judgment of the trial judge unless the evidence at trial led to but one conclusion and the trial court reached the opposite conclusion. This situation does not exist in this record.

*Hewitt,* 396 N.E.2d at 942–43. Our review of these cases reveals that in order to meet her burden of proof that she was acting in the best interests of her children, Bell needed to do more than present witnesses that she was a good mother who loved her children. Specifically, Bell needed to specify precisely why it would be in her children's best interests to permit her to withdraw her consents to adoption.

For example, in *Johnson, supra,* Gretchen Johnson petitioned to withdraw her consent to her daughter's adoption because the adoptive parents were infected with HIV, the virus which causes AIDS (Acquired Immune Deficiency Syndrome). Johnson testified, in effect, that it would not be in the child's best interest to be adopted and then orphaned. After finding that the adoptive parents were expected to develop AIDS in the next year or two, at which time they would have been unable to care for the child, the trial court granted Johnson's petition. This court empathized with the adoptive parents; however, we found that the trial court had not erred in determining that Johnson's withdrawal of her consent was in the child's best interest.

Here, Bell has not alleged that the adoptive parents were ill or unfit. Further, the record reveals that the adoptive parents have been married for 22 years, own their home, and are self-employed. They have 14 chil-

dren, eight of whom are from Guatemala. All of the children participate in family activities, such as camping, bike riding, and swimming. The four children at issue in this case began calling the Does "mom and dad" shortly after their arrival at the Doe's home. The evidence does not lead unerringly to a conclusion opposite the one reached by the trial court.

Affirmed.

RILEY and HOFFMAN, JJ., concur.