In the Matter of TERMINATION OF PARENT–CHILD RELATIONSHIP OF INFANT ELLIS, a child, and Tiffany Ellis and Marc Lumley.

Tiffany ELLIS, Appellant,

v.

CATHOLIC CHARITIES, Appellee.

No. 71A03–9701–JV–22.

Court of Appeals of Indiana.

June 13, 1997.

Transfer Denied Sept. 26, 1997.

Fred R. Hains, Rochelle S. Meyers, South Bend, for appellant.

George E. Herendeen, I.D., Allen, Fedder, Herendeen & Kowals, South Bend, for appellee.

## OPINION

STATON, Judge.

Terry Ellis, the natural mother of infant C. E., seeks to withdraw her consent to terminate her parental rights. She contends that Catholic Charities, the private organization that facilitated the adoption of her child duped her into signing a consent to terminate her parental rights by promising her that she would still be able to visit her child after he was adopted. The trial court ruled that her consent was valid, and terminated her parental rights. Tiffany presents three issues on appeal:

I. Whether she should be allowed to withdraw her consent because she objected in open court to the termination of her parental rights.

II. Whether her consent is invalid because Catholic Charities perpetrated fraud in order to obtain it.

III. Whether her consent was involuntary due to duress from Catholic Charities.

We affirm.

C.E. was born June 1, 1996, to Tiffany Ellis, eighteen years old at the time, who was unwed, estranged from her family, homeless, and nearly penniless. The whereabouts of the putative father were and continue to be unknown. On June 7, 1996, Tiffany executed documents consenting to the termination of her parental rights. Later, Tiffany appeared at the court hearing and attempted to withdraw her consent.

▇▇▇ Prior to the hearing Tiffany requested specific findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A). When a party has requested specific findings of fact and conclusions thereon pursuant to T.R. 52(A), the reviewing court cannot affirm the judgment on any legal basis; rather, this court must determine whether the trial court's findings are sufficient to support the judgment. *Lever Brothers Co. v. Langdoc*, 655 N.E.2d 577, 580 (Ind.Ct.App.1995). In

reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.*

▇▇▇ The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions entered on the findings. *De-Haan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind.Ct.App.1991), *trans. denied.* Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Matter of Estate of Banko*, 622 N.E.2d 476, 481 (Ind.1993), *reh. denied.* When determining whether the findings are clearly erroneous, we consider only the evidence most favorable to the judgment and the reasonable inferences flowing from that evidence. *Id.* We will not judge witness credibility or reweigh the evidence. *Id.* Claiming an invalid consent is an affirmative defense placing the burden of proof on Tiffany. *Snyder v. Shelby County Department of Public Welfare*, 418 N.E.2d 1171, 1178 (Ind. Ct.App.1981).

## I.

### Statutory Procedure

▇▇▇ Tiffany first argues that because she objected to termination of her parental rights at the court hearing her written consent must be considered invalid and held for naught. The statute allowing for voluntary termination of parental rights, IND.CODE § 31–6–5–2(c), states that:

The parents must give their consent in open court unless the court makes findings of fact upon the record that: (1) the parents gave their consent in writing before a person authorized by law to take acknowledgments; (2) they were notified of their constitutional and other legal rights and of the consequences of their actions under section 3 of this chapter; and (3) they failed to appear.

Before the court may enter a termination order, it must inquire about the reasons for the parents' absence, and may require an investigation by a probation officer to determine whether there is any evidence of fraud or duress and to establish that the

parents were competent to give their consent.... If there is any competent evidence of probative value that fraud or duress was present when the written consent was given, or that a parent was incompetent, the court shall dismiss the petition or continue the proceeding....

Tiffany contends that the language of the statute only allows parental rights to be terminated by a signed consent form if the parents fail to appear in court. Tiffany urges that "[b]ecause the statutes governing adoption are in derogation of the common law, they must be strictly construed as to all procedural requirements." *Petition of Gray,* 425 N.E.2d 728, 730 (Ind.Ct.App.1981), *trans. denied.* Since she appeared in open court, Tiffany argues, her written consent is irrelevant. She contends that the statute requires a determination made in open court as to the reasons for a parent's absence because parental rights are of such paramount importance in the law; the signed consent is allowed only as a substitute for having the natural parents appear in open court because of the problems which sometimes exist in procuring the attendance of the natural parents. Since she appeared in open court, Tiffany argues, her written consent should not have been accepted by the court as terminating her parental rights. She notes that her declaration in court was made at the first hearing on the termination of her parental rights and the earliest possible time for her to contest termination. Tiffany argues that her statement in open court is the most reliable evidence of her willingness to terminate her parental rights. Therefore, Tiffany concludes, it should control over a consent form. Tiffany further argues that the strict construction she urges is mandated by the principle that statutes governing termination of parental rights should not be so liberally construed that safeguards erected for the preservation of family relationships are destroyed. *Matter of Adoption of Topel,* 571 N.E.2d 1295, 1298 (Ind.Ct.App.1991).

Tiffany's interpretation of the statute was rejected by *Matter of Adoption of Konar,* 454 N.E.2d 886, 887 (Ind.Ct.App.1983), *trans. denied, cert. denied* at 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 203 (1984). *Matter of Konar*

explicitly overruled an earlier case, *Washington County Department of Public Welfare v. Konar,* 416 N.E.2d 1334 (Ind.Ct.App.1981), which had suggested a less demanding standard for revocation of consent. In *Matter of Konar* we stated that "insofar as our prior opinion might tend to indicate that parents consenting to a termination of parental rights may withdraw that consent at any time, we hereby expressly overrule *Konar.* It is clear that a parent's ability to withdraw such consent is extremely limited. *See Snyder v. Shelby County Department of Public Welfare,* (1981) Ind.App., 418 N.E.2d 1171, 1180, and Indiana Code sections 31–6–5–2, 3 (1982)." In *Snyder,* we reasoned that if natural parents had the right to arbitrarily revoke their consent then no purpose would be served by obtaining parental consent. *Id.* at 1180, quoting *Rhodes v. Shirley,* (1955) 234 Ind. 587, 596, 129 N.E.2d 60, 64 (an adoption case in which natural parents sought to withdraw their consent to adoption of their children, which rational we applied to revocation of consent):

> If a natural parent were allowed to arbitrarily withdraw his or her voluntary relinquishment of parental rights, then adoption of the child would be discouraged. Few prospective parents would want to start the lengthy process of adoption when there is a possibility that the natural parent would withdraw his or her relinquishment of parental rights, thus ending the adoption proceedings. A rule allowing the arbitrary withdrawal of a voluntary relinquishment of parental rights 'would subject every adoptive parent and child to the possibility of a most cruel and emotional turmoil, and because of this fact it would make adoptive parents the ready prey of possible unscrupulous parents.' Therefore, a parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors.

*Snyder,* 418 N.E.2d at 1180 (citation omitted).

The proper procedure to follow under IC 31–6–5–2 was outlined in *In Re M.S.,* 551

N.E.2d 881, 883 (Ind.Ct.App.1990), *trans. denied, cert. denied* at 498 U.S. 1121, 111 S.Ct. 1075, 112 L.Ed.2d 1181 (1991), where we explained that "[t]he statute says that a parent signing a consent form is entitled to receive notice of the hearing at which the court accepts her consent to relinquish parental rights *and* at which the court will determine if her consent was voluntary" (emphasis in original). *See also Bell v. Matter of Adoption of A.R.H.*, 654 N.E.2d 29, 32 (Ind. Ct.App.1995) ("The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner.") That is the procedure which was followed here.

## II.

### *Fraud*

■ Tiffany next contends that her consent was involuntary because it was procured through fraud. She argues that she signed the consent form only because she was under the impression that she would still be allowed to visit her son. Tiffany contends that Catholic Charities misled her into thinking that even after severing her parental rights and having the child adopted she would be able to visit her child.

Prior to her pregnancy Tiffany had been living with the family of her boyfriend, who was not the father, and had been considering placing her child for adoption with her boyfriend's parents. The attorney who was handling the adoption for the boyfriend's parents saw that Tiffany was reluctant to have her boyfriend's parents adopt her child. He referred her to Catholic Charities for counseling. Before the birth of C. E., Tiffany decided that she did not want the parents of her boyfriend to adopt her child. This decision caused a falling out between Tiffany and her boyfriend's family.

Catholic Charities counselor Barbara Burlingham–Brown convinced Tiffany to review a number of profiles of Catholic Charities' prospective adoptive couples. Tiffany eventually chose Debra and Steven Stockberger. After meeting with the Stockbergers Tiffany proceeded as though the Stockbergers would adopt Tiffany's child. Additionally, even though Tiffany had not executed her written consent for adoption, the Stockbergers were participating in pre-birth activities.

■ Throughout her discussions with Catholic Charities, Tiffany had emphasized the importance she placed on being allowed to visit her child. Burlingham–Brown told Tiffany that Catholic Charities would attempt to facilitate visitation through an arrangement termed an "open adoption". A purported "open adoption" is one in which the natural parent has visitation rights with her child. An "open adoption" is not recognized in Indiana. *See for example Matter of Adoption of Topel*, 571 N.E.2d 1295, 1298 (Ind.Ct. App.1991) ("A decree of adoption severs forever every part of the parent/child relationship. The child is severed entirely from its own family tree and engrafted upon another. For all legal and practical purposes, an adopted child is the same as dead to its parents. *The parents lose the right to ever see the child again* ") (citations omitted)(emphasis in original). However, while pledging the assistance of Catholic Charities in attempting to secure visitation for Tiffany if she were to give her child for adoption, Burlingham–Brown also informed Tiffany that such visitation would be allowed only at the sufferance of the adoptive parents. Tiffany testified that she was aware that "there is no such thing in the State of Indiana" as an "open adoption". R. 141. Moreover, she stated that Burlingham–Brown informed her of this the first time they met. R. 141.

Four days after C. E.'s birth, Tiffany executed a document allowing the Stockbergers to take the child home with them. The following day Tiffany was discharged from the hospital, and still had no place to stay, so Catholic Charities' Burlingham–Brown arranged temporary housing for Tiffany with another Catholic Charities' family, the Stenkes, who had previously adopted a child through Catholic Charities. Mrs. Stenke also discussed so called "open adoptions" with Tiffany. Two days after arriving in the Stenke home Tiffany executed documents given her by Burlingham–Brown which consented to severing her parental rights. On the day that Tiffany executed the documents giving up her parental rights, she also signed

a document containing both Catholic Charities' promise to serve as an intermediary in visitation disputes between the natural and adoptive parents, and an express disclaimer of the legal validity of the "open adoption" arrangement. After several weeks of allowing visitation, the Stockbergers recanted their agreement and refused Tiffany any further visitation. Tiffany then appeared at the hearing on termination of her parental rights on July 31, 1996, requesting that she be allowed to withdraw her consent. Burlingham–Brown acknowledged in her testimony at the hearing on the voluntariness of Tiffany's consent that indeed the ability to visit her child after severing her parental rights had been a great concern to Tiffany.

Tiffany's own testimony, however, shows that she was fully aware that she would have no right to visitation once she signed the consent to terminate her parental rights. The attorney for her boyfriend's parents gave her a sample consent to termination early in her pursuit of an adoption placement for her child. R. 182. She said that she thought long and carefully about adoption. R. 214. She turned down one family despite severe consequences to herself and chose another family, the Stockbergers, from among several options. Tiffany testified that she thought so carefully about it because: "Mrs. Brown told me that the agreements between the parents and the adoptive parents will not be held up in court and I was not sure if the Stockbergers would hold up to their agreement with me to see my son and being a part of his life." R. 148. When asked about her understanding of an "open adoption" Tiffany testified: "The only thing I was aware of is that there is no such thing in the State of Indiana." R. 141. Tiffany was then asked at what point in the adoption process she became aware of the fact that the "open adoption" concept is not recognized in Indiana law, and she answered that Burlingham–Brown "mentioned it the first time I met with her." R. 141. Tiffany then explained her ultimate decision to place her child for adoption: "Q. Did you sign all of these documents with the intention of giving up your child? A. Yes. Q. Why did you come to that decision? A. Because I knew that I would have to leave the Stenke house and I

had no where else to go. I didn't feel comfortable with taking a new-born out on the street." R. 153. Burlingham–Brown may have been irresponsible in encouraging the hope in a young mother that she would still be able to visit her child after giving the child up for adoption, but Tiffany's testimony shows that all she clung to was a hope, not any notion of legal rights. Tiffany's testimony shows that she was aware that consenting to termination of her parental rights would terminate all her legal rights, including the right to visitation, as C. E.'s parent. This evidence is sufficient to support the trial court's conclusion that Tiffany knowingly consented to termination of her parental rights.

## III.

### Duress

■ Tiffany next contends that her consent was obtained as a result of duress. Tiffany argues that Catholic Charities took advantage of her to further its own mercenary interests. She notes that she was homeless, penniless, and young. Catholic Charities was providing for her lodging, transportation, food, and medical bills. The Stenkes, with whom she was staying, had adopted a child through Catholic Charities. While she was staying with them, before signing the consent to terminate her parental rights, the mother of the Stenkes talked with Tiffany about Tiffany's pending decision on whether to relinquish her parental rights and go forward with adoption. Tiffany contends that her situation was inherently pressured by an unarticulated but nonetheless implicit threat: if she did not agree to give up her child, the help of Catholic Charities would be withdrawn. If this happened she would have no place to stay, no food, and no money to pay her medical bills.

Tiffany suggests that Catholic Charities' pecuniary interest in seeing the adoption completed provided the impetus for this veiled threat. The charity charges couples an initial inquiry fee of $80 to ask about adoptions. Then there is a fee of $225 for fourteen hours of adoption instruction. Next the charity requires $800 for a home assess-

ment of the prospective adoptive parents. If Catholic Charities actually delivers a child to a couple, the charity demands 12% of the couple's adjusted gross annual income as determined from tax filings. If the couple must relinquish control of a child back to the child's natural parents, Catholic Charities refunds the 12% fee. Tiffany contends that this set of interests and motivations, while she was reliant on Catholic Charities for the necessities of life, ultimately amounted to duress.

█ Though lamenting Catholic Charities' unseemly approach to adoption, Tiffany has not shown how any of this overcame her volition. The evidence presented showed that Tiffany was under pressure resulting from her pregnancy and attendant financial and family circumstances. ·"However, emotion, tensions, and pressure are ... insufficient to void a consent unless they rise to the level of overcoming one's volition." *Matter of Adoption of Hewitt,* Ind.App., 396 N.E.2d 938, 942 (1979). Tiffany's testimony did not tend to show that her free will was overcome. She rebuffed her boyfriend's parents in their quest to adopt her child, despite their resulting anger and the consequences of losing the refuge provided by their home. Instead she sought an alternative adoptive arrangement through Catholic Charities. She testified that she thought carefully about adoption, weighing the possibility of never seeing her child again against the prospect of caring for a newborn in the circumstances in which she found herself. While these reasons may no longer hold, as Tiffany testified that she now has a job, place to live, and is engaged to a fiancé with a good job, subsequent changes in her circumstances do not bear on the voluntariness of her decision at the time that it was made. The finality accorded termination of parental rights is designed to protect adoptive parents and children from the emotional turmoil of a natural parent rescinding her consent due to improved personal fortunes. *Snyder,* 418 N.E.2d at 1180.

Affirmed.

HOFFMAN, J., concurs.

RILEY, J., concurs in result with separate opinion.

RILEY, Judge, concurring in result.

I concur in result on Issue I. I find that *Matter of Adoption of Konar,* 454 N.E.2d 886 (Ind.Ct.App.1983), *trans. denied, cert. denied* at 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 203 (1984), has a different procedural history than the case before us and does not specifically reject Tiffany's interpretation of the statute. In *Matter of Konar,* the issue revolved around the court's failure to give Simpson notice of the adoption procedure. Here, Tiffany, after signing the Voluntary Consent to Termination of Parent–Child Relationship and Consent to Adoption on June 7, 1996, was notified that pursuant to Ind. Code 31–6–5–3–(8) she had the right to appear at the hearing on July 30, 1996, at which time the Court would decide whether or not the parent-child relationship should be terminated. She was notified that she could attend the hearing but if she did not attend the court would make a finding in her absence.

On July 30, 1996, Tiffany appeared in open court and advised the court that she felt her consent was involuntary because it was procured through fraud and duress. The court continued the hearing, heard further evidence and determined that Tiffany did knowingly and voluntarily give her consent to the adoption of her child and to the termination of the parent-child relationship. I concur that the procedure outlined in *In Re M.S.,* 551 N.E.2d 881 (Ind.Ct.App.1990), was followed with the additional safeguard that Tiffany was present at the court hearing where she was allowed to give her testimony.

I concur fully on Issues II and III.