Matter of the ADOPTION OF M.L.L.

Mary Ann Lowe, Appellant–
Respondent,

v.

Jeff and Krista White, Appellees–
Petitioners.

No. 48A02–0401–CV–2.

Court of Appeals of Indiana.

June 29, 2004.

George O. Lopez, Hinkle, Racster, Lopez & Clamme, Portland, IN, Attorney for Appellant.

David W. Stone IV, Stone Law Office, Anderson, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Mary Ann Lowe appeals the trial court's grant of Jeff and Krista White's Petition for Adoption of M.L.L., Lowe's biological daughter. Lowe presents the following issues for our review:

1. Whether the trial court has jurisdiction over the adoption.

2. Whether her consent to the adoption was voluntarily and validly executed.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On October 11, 2000, Lowe gave birth to M.L.L., out-of-wedlock, in Tennessee. In December 2001, Lowe filed a petition to establish paternity alleging that Ronald Stephens is M.L.L.'s father, which was confirmed by a paternity test. Also that month, Lowe contacted her cousin Jeff White, an Indiana resident, and asked him whether he would "take care of" M.L.L.

for her. But later that month, Lowe told Jeff that she had changed her mind about that arrangement.

On February 2, 2002, Scott County, Tennessee, Sheriff's Deputy Hubert Yancey arrested Lowe for possession of either methamphetamine or cocaine.[1] After her arrest, Lowe advised Deputy Yancey that she would be willing to act as a confidential informant ("CI") and execute a controlled drug buy with a certain drug dealer. Accordingly, Deputy Yancey arranged for Lowe to meet with officers from the Governor's Drug Task Force. While Lowe was waiting for those officers, she explained to Deputy Yancey that she was afraid for M.L.L.'s safety as a result of Lowe's participation in the drug buys, because the drug dealer was a dangerous man. Lowe told Deputy Yancey that as a result of that fear she was sending M.L.L. to live in Indiana.

In an attempt to make certain that Lowe would fulfill her obligations as a CI, Deputy Yancey explained that if she went to court on her drug charge, "the worst case scenario for her was the child protective services could get involved and she could lose her child." Lowe consistently expressed her willingness to act as a CI. She ultimately participated in three controlled drug buys.

On February 4, 2002, Lowe called Jeff's mother and asked her whether Jeff and Krista would still be interested in adopting M.L.L. So Jeff called Lowe, and she told him that she wanted him to come down to Tennessee to pick up M.L.L. "because there was some trouble." Jeff and Krista immediately left for Tennessee and arrived at 6:00 a.m. on February 5. Lowe met the Whites at their grandmother's house, and Jeff gave Lowe a Consent to Adoption and

a Consent to Guardianship for her signature. Jeff and Lowe then drove to the courthouse in Oneida, Tennessee, so that Lowe could execute the consents and have them notarized. Jeff asked Lowe to read the consents during the trip, and, upon their arrival, Lowe signed the consents in the presence of a notary public. The notary asked Lowe for identification and asked whether she had read and understood the consents before notarizing them. Lowe wanted to talk to a judge, but the judge's secretary told her she should consult with an attorney instead. Lowe and Jeff made an appointment to meet with an attorney later that day, but Lowe had a change of plans and did not meet with the attorney.

At the end of the day, Lowe helped the Whites pack M.L.L.'s belongings, and she gave them M.L.L.'s birth certificate and social security card. The Whites then took M.L.L. and returned to Indiana. On February 12, 2002, the Whites filed a Petition for Adoption and Lowe's Consent to Adoption with the Madison Circuit Court in Indiana.

On February 14, 2002, Lowe signed a Revocation of Consent to Guardianship and Revocation of Consent to Adoption Procedures, which was later filed with the Madison Circuit Court.[2] On February 20, Lowe sought and obtained a temporary restraining order from the Juvenile Court for Scott County, Tennessee, which provided in relevant part: "Jeffrey and Krista White are hereby restrained and prohibited from interfering with Petitioner's right to gain access to her minor child, [M.L.L.], and they are required to immediately surrender possession of said child to [Lowe]." Despite that order, M.L.L. continued to live with the Whites.

---

1. Officer Yancey could not recall which drug Lowe possessed, and the matter is not clarified in the record.

2. The copy of this document contained in Lowe's Appendix is not file stamped, but, in its findings, the trial court states that she filed it on March 27, 2002.

On February 26, following a hearing, a Tennessee court entered an order establishing Stephens' paternity of M.L.L. The court noted that "[a]n adoption of this child may be pending in Indiana." And the court stated that it "has not addressed any right [Stephens] may have to visitation or custody."

On March 4, the Juvenile Court for Scott County, Tennessee, held a hearing on Lowe's petition for the return of M.L.L. The Whites were not present, but their counsel, attorney Huff represented them at the hearing. Huff argued that Indiana had jurisdiction over this matter pursuant to the adoption petition, but the Tennessee court disagreed, finding in relevant part:

> [A]t the time the child was removed to the State of Indiana, there was a paternity petition pending in the Juvenile Court for Scott County, Tennessee, which had been filed in December 2001, prior to the removal of said child; that Respondents never dealt with the father of said child, and he never consented to the removal of the child; that Tennessee never gave up jurisdiction of the child; there was not an effective surrender of the child under Tennessee law; and the minor child should be immediately returned to Petitioner in the State of Tennessee.

Despite that order, M.L.L. continued to live with the Whites in Indiana.

On March 27, Lowe filed an Emergency Petition to Dismiss Adoption and Return Child with the Madison Circuit Court. Following a hearing on that petition, the court ordered that the Whites retain custody of M.L.L., but also granted Lowe visitation with her. The trial court heard evidence regarding the Whites' adoption petition and all pending motions beginning on November 22, 2002, and additional hearings were held on January 8, 2003, October 31, 2003, and November 5, 2003. On December 2, 2003, the trial court issued its findings and conclusions granting the Whites' petition to adopt M.L.L. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

As a reviewing court, we will not disturb the trial court's decision in an adoption proceeding unless the evidence at trial leads to but one conclusion and the trial court reached the opposite conclusion. *Bell v. A.R.H.*, 654 N.E.2d 29, 32 (Ind.Ct. App.1995). We will neither reweigh the evidence, nor assess the credibility of witnesses. *Id.* We examine the evidence most favorable to the trial court's decision. *Id.*

### Issue One: Jurisdiction

Lowe first contends that the trial court does not have jurisdiction over this matter under the Uniform Child Custody Jurisdiction Act ("UCCJA").[3] The UCCJA was adopted in part to avoid competition and conflict among courts of different jurisdictions in matters of child custody, to promote interstate cooperation in rendering custody decrees, and to deter abductions and other unilateral removals of children undertaken to obtain custody awards. *Hughes v. Hughes*, 665 N.E.2d 929, 931 (Ind.Ct.App.1996). Under the UCCJA, the trial court must first determine whether it has jurisdiction and, if it does, wheth-

---

3. In its conclusions, the trial court notes that "the (*Model*) Uniform Child Custody Jurisdiction Act was amended in 1997 to remove adoption proceedings from those custody matters covered by the Act." (Emphasis added). But nothing in Indiana's UCCJA, which was amended in 1997, indicates that it does not cover adoption proceedings. Regardless, the trial court concluded that it had jurisdiction "[e]ven if the UCCJA governs this litigation[.]" And Lowe does not assert that the UCCJA does not apply here.

er to exercise that jurisdiction. *Pryor v. Pryor,* 709 N.E.2d 374, 376 (Ind.Ct.App. 1999).

In determining whether a trial court has improperly exercised jurisdiction under the UCCJA, we apply an abuse of discretion standard. *Id.* An abuse of discretion will occur when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.*

The UCCJA provides in relevant part:

Jurisdiction. (a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) this state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state;

(2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and his parents, or the child and at least one (1) contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(3) *the child is physically present in this state and the child has been abandoned;* or

(4) (A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction.

(b) Except under paragraphs (3) and (4) of subsection (a) physical presence in this state of the child, or of the child and one (1) of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.

Ind.Code § 31–17–3–3 (emphasis added).

Here, the trial court found that M.L.L. was living in Indiana and that Lowe had abandoned M.L.L. at the time the adoption petition was filed. Thus, the trial court concluded that it had jurisdiction over the adoption petition under the UCCJA. Lowe contends that the evidence is insufficient to show that she abandoned her child. We cannot agree.

There is no statutory definition of "abandonment" as it relates to the UC-CJA, but our common law provides that "abandonment exists when there is such conduct on the part of a parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child...." *In re the Adoption of Force,* 126 Ind.App. 156, 131 N.E.2d 157, 159 (1956). Here, Lowe requested that the Whites take M.L.L. to live with them in Indiana, signed a consent to guardianship and a consent to adopt, and helped them pack M.L.L.'s belongings, including M.L.L.'s birth certificate and social security card. That evidence is sufficient to show that Lowe intended to forego her parental duties and relinquish her parental rights. Lowe merely asks that we reweigh the evidence, which we will not do.

The trial court did not err when it found that Lowe had abandoned M.L.L. for purposes of the UCCJA. Thus, under Indiana Code Section 31–17–3–3(a)(3), because M.L.L. was living in Indiana at the time that the Whites filed their adoption petition and Lowe had abandoned her, the trial court had jurisdiction over this matter.

■ Still, Lowe contends that the trial court lacks jurisdiction under Indiana Code Section 31–17–3–6(a), which provides in relevant part as follows:

> A court of this state shall not exercise its jurisdiction under this chapter if at the time of filing the petition *a proceeding concerning the custody of the child* was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.

(Emphasis added). Lowe maintains that because her paternity petition was pending in Tennessee at the time that the Whites filed their adoption petition in Indiana, the trial court was precluded from exercising jurisdiction. But the paternity action did not concern Stephens' *custody* of M.L.L., just his paternity. The Tennessee court's order establishing paternity expressly states that it had not determined visitation or custody. As such, Indiana Code Section 31–17–3–6(a) does not prohibit the trial court's exercise of jurisdiction in this matter.

Finally, Lowe maintains that Tennessee retains jurisdiction over this matter under the Interstate Compact on the Placement of Children ("the Compact"), which "relate[s] to the same general subject matter[ ]" as the UCCJA. *See In re Matter of C.B.*, 616 N.E.2d 763, 768 (Ind.Ct.App. 1993). But we need not address the jurisdictional rules under the Compact, because it does not apply to "[t]he sending or bringing of a child into a receiving state by the child's parent ... and leaving the child with ... [a] non-agency guardian in the receiving state." Ind.Code § 12–17–8–1, Article VIII. Because Lowe sent M.L.L. to Indiana to live with the Whites, whom Lowe designated as guardians,[4] the Compact does not apply here.

### Issue Two: Voluntariness and Validity of Consent

■ Lowe next contends that her consent was neither voluntarily nor validly executed. First, Lowe maintains that her consent was not voluntary because it was the result of "Officer Yancey's threats and pressure." Next, Lowe asserts that her consent is not valid because it was not executed in compliance with Tennessee law. We address each contention in turn.

■ For the execution of a parent's consent to an adoption to be valid, the consent must be voluntary. *Bell*, 654 N.E.2d at 32. A parent's consent to an adoption is voluntary if it is an act of the parent's own volition, free from duress, fraud, or any other consent-vitiating factor, and if it is made with knowledge of the essential facts. *Id.* The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner. *Id.* We have previously observed that " 'emotion, tensions, and pressure are ... insufficient to void a consent unless they rise to the level of overcoming one's volition.' " *Id.* at 32–33 (quoting *In the Mat-*

---

4. There are several references throughout the briefs and record on appeal to a Consent to Guardianship Lowe signed, which designated the Whites as M.L.L.'s guardians. Neither party has included a copy of that consent in their appendices. But Lowe testified that she signed and notarized a consent to guardianship in addition to the consent to adoption, and she moved the trial court to revoke both consents.

*ter of Adoption of Hewitt,* 396 N.E.2d 938, 942 (Ind.Ct.App.1979)).

Here, Lowe's sole contention on the voluntariness issue is that she would not have signed the consent to adoption if Officer Yancey had not threatened her with jail time and with having her child taken from her. Lowe does not contend that anyone else pressured her into giving her consent. In support of her contention, she directs us to the following excerpts of Officer Yancey's testimony:

Q: What approach did you take with her in regards to [her] criminal charge [on the drug possession]?

A: That is one of the main focuses as to why I'm here today. I believe it's partially my fault that I have placed too much pressure on Ms. Lowe. . . . I told her that, you know, you can work with us when she was adamant about working with us, but somewhat scared of working with or against the individual . . . [whom] I would consider to be dangerous. And I had told her that, you know, you can help us or you know, if we go to court, the judge will be aware that there [are] drug charges and that you have a child. At that point, we could intervene with child services. I said, "And once [child services] start[s its] investigation, it's out of our hands."

\*   .   \*        \*

Q: Okay. Would it be safe to say, Officer, that in trying to get people to work with you, and when I say work with you I mean trying to roll on somebody or trying to work with the Task Force or trying to get a bigger somebody else that . . . and again, I don't want to use the word lie, but at least officers give them what is the worst case scenario.

A: Yes, sir.

Q: And is that what you were doing with her?

A: Yes.

\*        \*        \*

Q: And, in fact, the worst case scenario for her was the child protective services could . get involved and she could lose her child.

A: Yes.

Q: And did you also say something about maybe losing her car or her home?

A: Yes, sir.

\*        \*        ·\*

Q: And upon giving her this worst case scenario, did she, in fact, agree to work for you?

A: Yes. *She was really wanting to work with us the whole time,* but I guess I did come across as too aggressive.

(Emphasis added).

Officer Yancey also testified that he discouraged her from "giv[ing] the child up." And the undisputed evidence shows that Lowe had first expressed her desire that the Whites take M.L.L. to live with them in December 2001, before she had been arrested or volunteered to serve as a CI. We cannot say that the only conclusion to be gleaned from the evidence is that Officer Yancey's pressure on Lowe to serve as a CI overcame her volition with regard to the adoption. The trial court did not err when it found that Lowe's consent was voluntary. Again, Lowe asks us to reweigh the evidence, which we will not do.

■ Lowe next contends that her consent is invalid because it does not comply with the requirements of the applicable Tennessee statute. Specifically, Tennessee Code Section 36–1–111 provides in relevant part that "[a]ll surrenders [of children] must be made in chambers before a

judge of the chancery, circuit or juvenile court...." Here, the evidence shows that Lowe's consent was notarized, but not signed in chambers before a judge.

But the validity of Lowe's consent is not governed by Tennessee law. We have established that the Madison Circuit Court has jurisdiction over the adoption proceedings. Indeed, consistent with Lowe's wishes at the time she signed the consent, the Whites filed the consent with an Indiana court. As such, Indiana law applies with regard to whether Lowe's consent was validly executed. *See, e.g., In re Adoption of C.L.W.,* 467 So.2d 1106, 1111 (Fla.Ct.App.1985) (citing Restatement (Second) of Conflict of Laws § 289 (1971) for rule that a court "generally applies its own state law in determining whether to grant an adoption[;]" and holding consent valid where mother executed consent in Pennsylvania with knowledge that adoption petition would be filed in Florida).

Indiana Code Section 31–19–9–2 provides in relevant part that a consent to adoption "may be executed at any time after the birth of the child either in the presence of: (1) the court; [or] (2) a notary public...." Because the evidence shows that Lowe executed her consent in the presence of a notary public, her consent is valid. The trial court did not err when it granted the Whites' adoption petition.

Affirmed.

RILEY, J., concurs.

KIRSCH, C.J., concurs with separate opinion.

KIRSCH, Chief Judge, concurring.

I fully concur. While I have concerns about the consent here at issue, the trial court resolved those concerns in favor of the adoptive parents, and we must defer to that court as the finder of fact.

I write separately only to note the anomaly in Indiana law that provides extensive protections for parents whose parental rights are being involuntarily terminated, but that provides almost no protections for parents who are voluntarily terminating their rights through adoption. On the one hand, we provide counsel, notice and hearing, and the full panoply of rights to individuals who have abused or neglected their children; on the other, we provide no protection for the parent who believes she is acting in the best interests of her child in giving the child up for adoption. A homeowner who buys home improvements through a conditional sales contract has the right to disclosures and the right to rescind the contract within a specified period of time. Shouldn't we provide as much protection to a parent who is giving up her child for adoption as we do to a person buying vinyl siding?