# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 27 2019, 7:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Kendra G. Gjerdingen
Mallor Grodner, LLP
Bloomington, Indiana

Frederick A. Turner
Bloomington, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

Kara Reagan
Matthew T. Schulz
Schulz Reagan, LLC
Bloomington, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.P. and J.P., *Appellants-Respondents,* v. J.M and S.M., *Appellees-Petitioners,* and The Indiana Department of Child Services, *Appellee-Intervenor.* | June 27, 2019 Court of Appeals Case No. 19A-AD-93 Appeal from the Monroe Circuit Court The Honorable Stephen R. Galvin, Judge Trial Court Cause No. 53C07-1806-AD-69 & 53C07-1806-AD-70 |

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellants-Respondents, J.P. (Mother) and J.P. (Father) (collectively, Biological Parents), appeal the trial court's denial of their request to withdraw their respective consents to the adoption of J.L.P. and A.A.P. in favor of the Appellees-Petitioners, J.M. and S.M. (collectively, Adoptive Parents).

[2] We affirm.

## ISSUES

[3] The Biological Parents collectively present eight issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred by denying the Biological Parents' motion to withdraw their respective consents to the adoption of J.L.P. and A.A.P. in favor of the Adoptive Parents; and

(2) Whether the Biological Parents were denied due process in the underlying proceeding.

## FACTS AND PROCEDURAL HISTORY

[4] The Biological Parents together have thirteen children, including J.L.P. and A.A.P., born in May 2014, and March 2017, respectively. In 2011, prior to the birth of the J.L.P. and A.A.P., Father battered Mother and threatened to kill her. Father was arrested for intimidation and battery. When the Greene

County Department of Child Services (DCS) investigated the incident, Mother reported that Father had choked and "battered her many times over the past several years." (Appellant's Amended Joint App. Vol. II, p. 17). Mother further alleged that her minor children had witnessed the violence and also seen Father point a "firearm" at her "many times." (Appellants' Amended Joint App. Vol. II, p. 17).

[5] Through several orders in Cause Number 28C01-1108-JC-22 through 30, Father was removed from the home. Thereafter, DCS created a safety plan for the children. Mother did not comply with the safety plan, and on August 5, 2011, the children were removed from the home. At a dispositional hearing held on September 21, 2011, eight children who were under the care of the Biological Parents were found to be Children in Need of Services (CHINS). The Biological Parents were then ordered to participate in services.

[6] On February 8, 2012, the Biological Parents' eight children were placed with Mother for a trial home visit, but Father was not allowed to have any unsupervised contact with the children. By the fall of 2012, Father had successfully completed the Intensive Outpatient Program (IOP) and an anger management program. Also, the Biological Parents had engaged in joint therapy. In August 2012, the CHINS cases filed in Greene County were dismissed. The family was then living in Monroe County.

[7] On June 5, 2013, the Monroe County DCS received a report alleging that the Biological Parents were manufacturing methamphetamine and that domestic

violence was occurring in their home. DCS visited the Biological Parents' residence following that report. During the visit, DCS observed that the Biological Parents' five-year-old daughter had dry "fecal matter" in her underwear. (Appellants' Joint App. Vol. II, p. 76). Also, the children "smelled of urine." (Appellants' Joint App. Vol. II, p. 77). When DCS interviewed Father, Father's "pupils were dilated. He rocked back and forth. He was fidgeting and sweating. He could not put a clear sentence together." (Appellants' Joint App. Vol. II, p. 76). Father was opposed to a drug screen, but the next day, he submitted to one and he tested positive for Hydrocodone.

[8] Under Cause Numbers 53C07-1306-JC-307 through 315, CHINS petitions were filed, and a total of eight children who were in the care of the Biological Parents were removed from the home. Following a fact-finding hearing held in August 2013, the trial court declared the eight minor children as CHINS. The Biological Parents were ordered to participate in services, but neither parent engaged in the offered services until October 2013. On March 20, 2014, the trial court found that the Biological Parents were not regularly visiting with the children, neither parent had completed a mental health or substance abuse evaluation, or participated in individual or family therapy, and had generally failed to provide drug screens.

[9] In May 2014, Mother gave birth to J.L.P. At a permanency hearing held on June 2, 2014, the trial court noted some progress with the Biological Parents' participation with the offered services. By September 2014, the Biological Parents were compliant with the offered services and DCS began introducing

the children back into the Biological Parents' home. On April 20, 2015, the CHINS cases filed in Monroe County were dismissed.

[10] On March 19, 2017, A.A.P. was born. At birth, A.A.P. was observed to suffer from withdrawal symptoms. "Her Finnigan score, which is used to describe the level of withdrawal symptoms, was between a 7 and 10 on a scale of 1 to 10. [A.A.P.'s] meconium was positive for methamphetamine, amphetamine, and hydrocodone." (Appellants' Amended Joint App. Vol. II, p. 20). Mother admitted that she had used Father's Suboxone, a pain prescription drug, during her pregnancy. Mother slept the entire time while in the hospital and she could not properly care for A.A.P.

[11] On March 23, 2017, DCS visited the Biological Parents' home. Mother was still in the hospital with A.A.P. who was in neonatal intensive care unit (NICU). Father aggressively answered the door while stumbling. Father appeared to be impaired, was wearing "two different shoes on and knee brace around his calf." (Appellants' Amended Joint App. Vol. II, p. 20). DCS observed that the Biological Parents' home was in a deplorable state. The home was dirty and cluttered, it was littered with cigarette butts, and the kitchen was unsanitary with dirty dishes and spoilt food. DCS noted that the children had not eaten all day, and they "smelled bad." (Appellants' Amended Joint App. Vol. II, p. 21). Some children were dressed in dirty clothes, and some were dressed in attires that were not appropriate for the winter months.

[12] The following day, March 24, 2017, through several cause numbers, CHINS petitions for the Biological Parents' nine children, including J.L.P. and A.A.P., were filed. The children were subsequently removed from the Biological Parents' home. J.L.P. spent ten days in a foster home and was then placed with the Adoptive Parents. A.A.P. spent three weeks in NICU and was then placed with the Adoptive Parents after being discharged from the hospital.

[13] On June 8, 2017, through a dispositional order, the Biological Parents were ordered to participate in services including substance abuse treatment, therapy, home based case management, random drug screens, and supervised parenting time. At a periodic review held on September 18, 2017, the trial court noted that the Biological Parents had failed to appear for drug screens and were not regularly visiting with the children. At another review hearing in December 2017, the Biological Parents were noncompliant with the offered services and had failed to visit the children.

[14] On December 28, 2017, DCS filed the petitions to terminate the Biological Parents' parental rights (TPR) to each of their nine minor children. On March 19, 2018, the trial court held a permanency hearing for the TPR proceedings. Following that hearing, and concurrent with the permanency plan in the TPR proceedings, the trial court issued an order approving the permanency plan of adoption.

[15] On June 11, 2018, the trial court conducted a factfinding hearing for the adoption and TPR. The parties appeared with their court appointed counsels.

Mother was then expecting her fourteenth child. At some point during the hearing, the trial court allowed the parties to separately consult with their attorneys on how to proceed at the hearing. After two hours of consultation, the trial court resumed the hearing. The Biological Parents then presented signed consents for the adoption of J.L.P. and A.A.P. The record shows that DCS "was prepared to proceed with the termination hearing" had the parents not signed the consents. (Appellants' Amended Joint App. Vol. II, p. 80).

[16] On June 26, 2018, under Cause Numbers 53C07-1806-AD-69 and 70, the Adoptive Parents filed verified petitions to adopt J.L.P. and A.A.P., and the Biological Parents' signed consents were attached to the petitions. On July 3, 2018, the Biological Parents filed timely motions to withdraw their consents. On July 13, 2018, the Adoptive Parents filed an objection to the withdrawal of the Biological Parents' consents. On October 31, 2018, DCS requested to intervene in the adoption cases, and their request was granted.

[17] On November 12, 2018, the trial court held an evidentiary hearing on the Biological Parents' motion to withdraw their respective consents to J.L.P.'s and A.A.P.'s adoption by the Adoptive Parents. The Biological Parents, Adoptive Parents, and the court-appointed counsels, who represented Mother and Father in the CHINS cases testified. Subsequently, on December 13, 2018, the trial court issued an Order denying the Biological Parents' request to withdraw their consents and it entered the following pertinent findings of fact and conclusions thereon:

## Findings of Facts

26. On July 3, 2018, [The Biological Parents] filed correspondence which the [c]ourt construed as a request to withdraw their consent for [J.L.P. and A.A.P.] to be adopted.

* * * *

28. On November 13, 2018, a hearing was held on the [Biological Parents'] request to withdraw their consent to the adoption of [J.L.P. and A.A.P.]

29. [Father] admits that he signed the consents for [J.L.P. and A.A.P.] to be adopted on June 11, 2018. However, he testified that he was told that if he did not sign he would not be allowed to see his children and that his unborn child would be taken at birth. [Father] testified that he did not read the documents and that he was not told that he was signing away his parental rights. He testified that he "just got pissed off and signed the paper." He alleges that he was coerced into signing by his attorney. [Father] is not a credible witness. His testimony is not truthful.

30. Attorney Jason Meredith [(Attorney Meredith)] represented [Father] in the CHINS cases and the termination cases. [Attorney] Meredith testified that [Father] understood what he was signing. There was no coercion or duress. [Attorney] Meredith is a credible witness.

31. [Mother] testified that she did not understand what she was signing. She also testified that she was told if she did not sign, she would not be allowed to see the children and her unborn child would be taken away at birth. She testified that she did not review the consent to the adoption before signing. [Mother] is not a credible witness. Her testimony is not truthful.

32. [Mother] was represented by attorney Kara Hancuff [(Attorney Hancuff)] in the CHINS cases and the termination cases. [Attorney] Hancuff testified that she explained the consents to adoption in detail to [Mother]. She spent at least two hours explaining the document to [Mother] on the day of the termination hearing. She did not force [Mother] into signing. She did not threaten [Mother]. [Attorney] Hancuff testified that [Mother] understood what she was signing. [Attorney] Hancuff observed [Attorney] Meredith reading the consent form to [Father]. [Father] corrected [Attorney] Meredith on the date of birth on one of the children. [Attorney Hancuff] is a credible witness.

33. [Biological Parents] recently began to participate in services.

34. [Mother] now has a prescription for Suboxone. She has begun to participate in drug screens which are positive for Suboxone. However, she missed a drug screen two weeks ago. She states that she missed the screen because she did not receive a call from the screener. As previously noted, [Mother] is not a credible witness. [Mother] has not participated in IOP. She states that she does not want to participate in a group setting. She believes that IOP would be detrimental to her recovery.

35. [Father] participated in 2 of 4 Recovery Process sessions in October. [Father] is testing positive for Suboxone. He claims to have a prescription. He did not produce this alleged prescription. As previously noted, [Father] is not a credible witness.

36. [The Biological Parents] are not employed. They are currently homeless and living in their van.

37. [The Biological Parents] have a lengthy history of substance abuse. However, they continue to deny that [A.A.P.] was born with methamphetamine in her system. They do not believe that

[DCS] was justified in removing the children. The [Biological Parents] state that they do not need services. [Mother] testified that she used to have an addiction to hydrocodone. She testified that she last used hydrocodone on the day [A.A.P.] was born. She obtained the hydrocodone from [Father]. [Mother] denies using methamphetamine, even though [A.A.P.] tested positive for methamphetamine at birth. [The Biological Parents] are clearly not benefiting from any services they are currently receiving.

38. [Mother] testified that she and her husband are not able to care for the children at this time.

39. [The Adoptive Parents] have been married for 11 years. [J.L.P. and A.A.P.] have been in their care since the beginning of April 2017. They love [J.L.P. and A.A.P.] They wish to adopt J.L.P. and A.A.P.

40. [Mother] admits that [J.L.P. and A.A.P.] are loved and well cared for in the [Adoptive Parents'] home. [Mother] testified that if the [Biological Parents] cannot have [J.L.P. and A.A.P] returned to them, she agrees that the [Adoptive Parents] should adopt [J.L.P. and A.A.P].

* * * *

## Conclusions of Law

1. [Biological Parents] are seeking to withdraw their consents to the adoption of [the Children] pursuant to Indiana Code [section] 31-19-10-3(a). . .

* * * *.

7. The children were removed for [the] third time on March 24, 2017—less than two years after their last [CHINS] case was closed. [A.A.P.] tested positive for methamphetamine, amphetamine, and hydrocodone at birth. She suffered extreme withdrawal symptoms. She spent the next three weeks in the hospital. [Mother] did not properly care for [A.A.P.] while she was in the hospital. [Mother] slept while the baby cried. Nurses had to care for [A.A.P.] [Father] was found to be impaired. He was stumbling and aggressive. He could not stand for any length of time. When confronted, he walked away from the residence and left the children alone. No other adult was present. The home conditions were extremely poor. The children had not eaten all day. The children were dressed in dirty clothes and smelled bad. The older children were caring for the younger children. The parents were rarely home. The children had not been attending school.

8. [The Biological Parents] did not comply with the dispositional orders. They did not appear for drug screens. They went long periods without visiting the children, once failing to visit for over four months. On March 19, 2018, a permanency plan for termination of the parent-child relationship was approved. Neither parent had completed a substance abuse assessment. Neither parent was participating in substance abuse treatment. They were not regularly participating in drug screens.

9. [The Biological Parents] note that they have recently begun to comply with some court ordered services. They fail to note that they did not comply for almost 18 months. Further, the [Biological Parents] have not benefited from the services they have received during this brief period. The [Biological Parents] continue to deny that [A.A.P.] was born with methamphetamine in her system. They continue to state that [DCS] was not justified in removing their children. They continue to believe that they do not need services.

10. The [Biological Parents] also testified that they did not understand that they were signing consents for their children to be adopted. They testified that they did not know what they were signing and that they were coerced into signing the documents by their attorneys. Their attorneys testified that the [Biological Parents] understood what they were signing. These attorneys took great pains to ensure that the [Biological Parents] understood. The [Biological Parents'] testimony was clearly not truthful.

11. [J.L.P. and A.A.P.] were placed with [the Adoptive Parents] in early April 2017. This is the only home that [A.A.P.] has ever known. [J.L.P.] displays substantial anxiety when faced with the possibility that she could be removed from this home. The [Adoptive Parents] love these children and wish to adopt them. They can clearly provide the children with a safe and stable home that their parents cannot and will not provide.

12. [The Biological Parents] have offered no meaningful evidence that they are acting in the best interests of [J.L.P. and A.A.P.] in attempting to withdraw their consents for the children to be adopted. Indeed, the evidence is overwhelming that it is in the best interests of [J.L.P. and A.A.P.] that they be adopted by [Adoptive Parents]

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that:

1. The request to withdraw parental consent to the adoption of [J.L.P. and A.A.P.] filed by [the Biological Parents] is denied.

(Appellants' Joint Amended App. Vol. II, pp. 80-85)

[18]     The Biological Parents now appeal.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Consent*

### A. *Standard of Review*

[19]     The Biological Parents contend that the trial court erred in finding that they validly consented to the adoption of J.L.P. and A.A.P.  When we review a trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to only one conclusion and the trial court reached the opposite conclusion.  *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 903 (Ind. Ct. App. 2008).  We will not reweigh the evidence; rather, we will examine the evidence most favorable to the trial court's decision together with the reasonable inferences drawn therefrom.  *Id*.  We will affirm if sufficient evidence exists to sustain the decision.  *In re Adoption of M.A.S.*, 815 N.E.2d 216, 219 (Ind. Ct. App. 2004).  The trial court is presumed to be correct and it is the appellant's burden to overcome that presumption.  *Id*.

[20]     The adoption statute creates a proceeding unknown at common law.  *In re B.W.*, 908 N.E.2d 586, 593 (Ind. 2009).  This court must strictly construe the statute in favor of the rights of biological parents.  *Id*.  However, we must also be mindful that "careful administration of the statute serves purposes beyond protecting the rights of natural parents to be with their children."  *In re Adoption of A.S.*, 912 N.E.2d 840, 848 (Ind. Ct. App. 2009).  "It also serves to protect

children and to shield all involved parties from unnecessary instability and uncertainty." *Id*.

[21] Indiana Code section 31-19-10-3 provides in relevant part as follows:

> (a) A consent to adoption may be withdrawn not later than thirty (30) days after consent to adoption is signed if:
>
> > (1) the court finds, after notice and opportunity to be heard afforded to the petitioner for adoption, that the person seeking the withdrawal is acting in the best interest of the person sought to be adopted; and
> >
> > (2) the court orders the withdrawal.

[22] For the execution of a parent's consent to adoption to be valid, the consent must be voluntary. *Bell v. A.R.H.*, 654 N.E.2d 29, 32 (Ind. Ct. App. 1995). "Consent is voluntary if it is an act of the parent's own volition, free from duress, fraud, or any other consent-vitiating factors, and if it is made with knowledge of the essential facts." *Id*. The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof by clear and convincing evidence falls on the petitioner. I.C. § 31-19-10-0.5.

### B. *Validity of Mother's Consent*

[23] Mother's contention on appeal is that her consent to adoption and relinquishment of parental rights were not made voluntarily because (1) her consent was conditioned upon her belief that she would retain contact with J.L.P. and A.A.P. post adoption; and (2) that she was misled by her counsel,

Attorney Hancuff, at the time she executed the consents—*i.e.*, that Attorney Hancuff advised her that DCS would file a CHINS case against her fourteenth child upon birth if she failed to give her consent to the adoption.

[24] Turning to Mother's first contention, the record fails to support Mother's claim that her consent was conditioned upon her belief that she would remain in contact with J.L.P. and A.A.P. after she consented to the adoption. At the evidentiary hearing, when Attorney Hancuff was asked if Mother's allegations were true, she stated, "I think DCS said yes, visitation would continue." (Tr. Vol. II, p. 82). While her answer was in the affirmative, Attorney Hancuff's response was not a definitive statement and the record lacks any conclusive statement from DCS supporting Mother's claim. Moreover, at the evidentiary hearing, the Adoptive Parents refuted that they were to enter into a post-adoption contract which would allow the Biological Parents to remain in contact with J.L.P. and A.A.P. *See* Ind. Code § 31-19-16-2(3) (stating that post-adoption visitations would require, among other things, the consent of the adoptive parents). Contrary to Mother's assertions on appeal, however, it is clear from the record that post-adoption visitation privileges were never guaranteed after the consents were signed, nor was Mother's decision contingent upon her receiving post-adoption visits with J.L.P. and A.A.P.

[25] As for Mother's second contention that she was misled by Attorney Hancuff— that DCS would pursue a CHINS case against her fourteenth child upon birth if she had failed to consent to the adoption of J.L.P. and A.A.P.—this argument lacks merit. Attorney Hancuff contradicted Mother's claim by explaining that

she certainly did not offer that advice in "those terms," rather she accurately explained to Mother the implications of the pending CHINS cases to Mother's unborn child. Attorney Hancuff advised Mother that DCS would remain "involved" in her life and in the life of her unborn child due to the open CHINS cases. (Tr. Vol. II, p. 82, 83).

[26] Contrary to Mother's contentions on appeal, our review of the record leaves us convinced that no false material representations, such as post-adoption visitations guarantees, were made to induce Mother to consent to the adoption of J.L.P. and A.A.P. Also, the conversation that Attorney Hancuff had with Mother on the date of the termination hearing involved accurate legal advice and an assessment of the likely outcomes of each of the options available to Mother. Thus, we hold that Mother's consent to the adoption of J.L.P. and A.A.P. was valid and was made with full understanding of the consequences and essential facts and was not obtained through fraudulent means. Thus, we affirm the trial court in all respects.

### C. *Validity of Father's Consent*

[27] Although Father filed his own appellate brief, he repeats Mother's arguments word for word and does not attempt to explain or give reasons why his consent to the adoption of J.L.P. and A.A.P. was invalid. We find that Father has waived his argument for appeal. *See* Indiana Appellate Rule 46(A)(8)(a). While Father waives his issue for appellate review, we address the matter considering the significant issue at stake.

[28]     On the issue of whether Father's consent to the adoption was valid, the trial

court entered the following pertinent findings

> 29. [Father] admits that he signed the consents for [J.L.P. and
> A.A.P.] to be adopted on June 11, 2018. However, he testified
> that he was told that if he did not sign he would not be allowed
> to see his children and that his unborn child would be taken at
> birth. [Father] testified that he did not read the documents and
> that he was not told that he was signing away his parental rights.
> He testified that he "just got pissed off and signed the paper." He
> alleges that he was coerced into signing by his attorney. [Father]
> is not a credible witness. His testimony is not truthful.
>
> 30. Attorney Jason Meredith [(Attorney Meredith)] represented
> [Father] in the CHINS cases and the termination cases.
> [Attorney] Meredith testified that [Father] understood what he
> was signing. There was no coercion or duress. [Attorney]
> Meredith is a credible witness.

(Appellant's Joint App. Vol. II, p. 81). Father does not challenge these

findings. Because Father has not challenged the propriety of the above findings

upon which the trial court could have relied to reject his request to withdraw his

consent to the adoption, we interpret his contentions as requests to consider

evidence contrary to the judgment and reweigh the evidence and findings,

which we cannot do. *See In re Adoption of H.N.P.G.*, 878 N.E.2d at 903. We will

not second guess the trial court's evaluation of the evidence, and we affirm the

trial court's finding that Father's consent was not undermined or was in any

way invalid.

## II.  *Due Process*

[29]    Due process safeguards preclude "state action that deprives a person of life, liberty, or property without a fair proceeding." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quoting *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011)).

[30]    Mother argues

> Because DCS did not proceed with the termination of parental rights case, choosing instead to rely on the consents signed by Mother with respect to J.L.P. and A.A.P., it relieved itself of the burden of terminating [her] parental rights under the clear and convincing standard. DCS was able to shift the burden in terminating [her] parental rights from DCS to Mother, who must now either prove her consents are not valid because they were not voluntary or that she is acting in the best interest of the children in seeking the withdrawal of those consents.

(Mother's Br. p. 18). Father's due process claim on appeal mirrors Mother's.

[31]    The Biological Parents' argument that DCS should have gone forward with the TPR cases instead of seeking their consent to the adoption of J.L.P. and A.A.P., wholly lacks merit. The Biological Parents do not cite any controlling authority that DCS should have pursued such a route. Moreover, under the advisement of their appointed counsels, the Biological Parents chose to pursue the adoption avenue instead of going forward with a termination hearing. Under the circumstances, DCS was not required to move forward with the TPR factfinding hearing.

[32]    To the extent the Biological Parents argue that there was unfair burden-shifting, we find this argument without merit. A party who has previously executed a

consent to an adoption can withdraw their consent by filing a motion with the court to withdraw consent. I.C.§ 31-19-10-1(c). However, there are limits on a party's ability to withdraw a consent to adoption. Indiana Code section 31-19-10-3 provides that a party who is seeking to withdraw consent cannot arbitrarily revoke but must instead specify precisely why it is in the child's best interest to permit her to withdraw her consent. *See also Bell*, 654 N.E.2d at 34.

[33] As we have already concluded, the Biological Parents validly executed their respective consents to the adoption of J.L.P. and A.A.P. The adoption statute provides that when the Biological Parents sought to withdraw their consent to the adoption, the burden of proof properly shifted to them to show why their withdrawal was in their children's best interests. *Id*. Following a full evidentiary hearing on the Biological Parents' motion to withdraw their consent to the adoption of J.L.P. and A.A.P., the trial court issued the following finding:

> The Biological Parents] have offered no meaningful evidence that they are acting in the best interests of [J.L.P. and A.A.P.] in attempting to withdraw their consents for the children to be adopted. Indeed, the evidence is overwhelming that it is in the best interests of [J.L.P. and A.A.P.] that they be adopted by [Adoptive Parents]

(Appellants' Amended Joint App. Vol. II, p. 83). The Biological Parents have not challenged the propriety of the above finding, and we interpret their request as an invitation for us to reweigh the evidence. Accordingly, we conclude that the Biological Parents were not deprived of due process.

# CONCLUSION

[34]    Based on the foregoing, we hold that the trial court did not error in denying the Biological Parents' request to withdraw their respective consent to the adoption of J.L.P. and A.A.P. in favor of the Adoptive Parents.  Also, we conclude that the Biological Parents were not deprived of due process.

[35]    Affirmed.

[36]    Bailey, J. and Pyle, J. concur